**D.J. WEIR, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 88–AR–5130–NW.

United States District Court,
N.D. Alabama,
Northwestern Division.

June 29, 1989.

D.J. Weir, Florence, Ala., pro se.

Frank W. Donaldson, U.S. Atty., James D. Ingram, Asst. U.S. Atty., Lance J. Wolf and Cindy Lewis, Trial Attys., Tax Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

## MEMORANDUM OPINION

ACKER, District Judge.

This is an action brought pursuant to 26 U.S.C. § 6703(c), by D.J. Weir, *pro se*. Section 6703(c) is a procedural statute which first became effective on September 3, 1982. It provides that a person against whom a penalty pursuant to 26 U.S.C. § 6700 has been assessed by the Secretary of the Treasury as a result of the person's alleged participation in the formation or selling of an abusive tax shelter may pay to the Internal Revenue Service an amount not less than 15% of the amount of the penalty, file a claim with the IRS for a refund of the amount so paid, and, if the refund is denied, then bring an action in federal court for a determination of the assessed person's liability, if any, under § 6700. Because this opinion largely involves a discussion of the contentions contained in the government's post-trial brief, the Clerk is directed to file the government's brief which otherwise would not be a matter of record. Weir's post-trial brief is a layman's effort which adds little and will not be filed.

### Background

Before trial, the government moved for summary judgment under Rule 56, F.R. Civ.P. The Rule 56 motion, denied on May 5, 1989, contended that this court lacked jurisdiction, alleging that Weir failed to fulfill the statutory preconditions for filing this action. The merits of the assessment itself were not addressed in the government's Rule 56 motion and were not discussed by the court in its opinion of May 5. The court need not here repeat its reasons for denying the government's Rule 56 motion except to expand upon one aspect.

The purported penalty that is the subject of this proceeding was assessed pursuant to 26 U.S.C. § 6700(a), which is styled *"Promoting abusive tax shelters, etc."*, and which, as of the date Weir filed his complaint, provided:

Imposition of penalty.—Any person who—

(1) (A) organizes (or assists in the organization of)

(i) a partnership or other entity.

(ii) any investment plan or arrangement, or

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (a), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter,

shall pay a penalty equal to the greater of $1,000 or 20 percent of the gross income derived or to be derived by such person from such activity.

Weir admittedly participated in the sale of 34 separate interests in so-called "leaseholds" in certain so-called "music master recordings" owned and promoted by Mid–South Music Corporation. The IRS insists not only that Mid–South was itself an abusive tax shelter but that these 34 interests, however they are categorized, were accompanied by Weir's giving of false and fraudulent information to his various purchasers

during his sales pitches. The personal income derived by Weir in the years 1982 and 1983 as commissions from these 34 sales is conceded by both parties to be $26,914.83.

■ When this court wrote its opinion of May 5, it was puzzled by the fact that the purported assessment filed by the IRS on October 19, 1988, was exactly $26,914.83, the *entire income* derived by Weir from his allegedly abusive tax shelter sales, rather than $1,000.00 or $5,382.96 (20% of $26,914.83). The government's earlier explanation, which is the explanation it still gives, is unsatisfactory. At trial, Paul Williams, an IRS agent, testified that he chose not to employ either of two statutorily mandated alternative methods for computing the penalty. Instead, he reasoned (if what he did can be called "reasoning") that while the penalty could be either $1,000.00 *per sale* ($34,000.00 as a result of 34 sales), or 20% of the illegally derived gross income ($5,382.96 in this case), he felt that $34,000.00 would be an unreasonably high penalty inasmuch as it would be more than the entire income which Weir derived from his alleged sales, so the agent arbitrarily reduced the assessment to an innovative *third* alternative, namely, $26,914.83, Weir's entire illegal income. This reiteration at trial of the IRS's previously confessed aberrational computation only serves to confirm that this court was correct in allowing Weir access to this court by virtue of his having paid $807.44 (15% of 20% of his total income derived from the activity). This court, therefore, now reaffirms its finding that Weir did meet the statutory preconditions for filing suit in federal court. The IRS could not close this court's doors on Weir by employing an assessment formula not authorized by Congress.

■ The burden of proof was on the government to prove the essential elements which would justify its assessment. 26 U.S.C. § 6703(a). While an argument might be made for this burden to be "beyond a reasonable doubt" because of the very sizeable penalty or punishment which might result, this court is convinced that Congress intended the lesser "by a preponderance of the evidence" burden of proof recognized in *Franklet v. United States*, 578 F.Supp. 1552 (N.D.Cal.1984), *aff'd*, 761 F.2d 529 (9th Cir.1985).

The government did not plead "collateral estoppel" as a means of meeting its burden of proof of one of the essential elements of its case. No theory of "collateral estoppel" or of "issue preclusion" was mentioned in the government's answer or in the pre-trial order. Yet, in its post-trial brief, as it had done at trial, the government relied wholly upon "collateral estoppel" to prove the requisite statutory intent by Weir to misstate to his purchasers the tax effect of the tax shelter.

### Findings of Fact

The government did not attempt to prove its penalty based on that alternative violation described in § 6700 involving a "gross valuation overstatement." This separate possible violation is contained in § 6700(a)(2)(B). No expert opinion was offered by the government as to the actual fair market values of the interests which Weir sold. Although the court would guess that the master recordings were worth much less than represented, for aught appearing in this evidence they were worth exactly what Mid–South and Weir said they were worth. Instead, the government relied entirely on the alternative set forth in § 6700(a)(2)(A), which requires, *inter alia*, a specific fraudulent intent as an essential element for the assessment of the penalty.

The court will examine the evidence bearing on the several elements relied on by the IRS, each element being essential for establishing liability under § 6700(a)(2)(A).

#### First Element: Proven

The first element necessary in order for liability to attach under that part of § 6700 relied upon here by the IRS is that the person assessed either assisted in organizing the alleged abusive tax shelter, or that he participated in the sale of an interest in the tax shelter. Weir took no part in organizing Mid–South. However, he did take part in organizing informal partnerships or joint ventures between or among his clients

who, through these arrangements, indirectly purchased interests (called "securities" by the State of Alabama) in the Mid–South scheme. This distinction becomes academic because Weir admits having actually *sold* 34 interests of some kind, direct or indirect, in the Mid–South "leaseholds." Thus, the government has clearly met its burden of proving the first essential element.

### Second Element: Proven

The second element essential to a successful assessment against Weir is that Weir made some representation to a purchaser that the tax shelter did, in fact and law, provide the desired tax consequences. Weir admits that he stated to his customers his belief in the efficacy of the sheltering scheme outlined in the promotional material provided to him by Mid–South and by him to his customers. One of Weir's customers, Alene Ray, confirmed that Weir's sale to her was accompanied by what turned out to be erroneous tax advice. Thus, the United States successfully met its burden of proving this element.

### Third Element: *Not* Proven

The third element, just as essential as the first two, is that Weir *knew or had reason to know* that some statement or statements he made relative to the tax consequences of the purchase were "false or fraudulent as to any material matter." The government woefully failed in its effort to prove this element. There are at least three reasons how and why the government fell short.

A. In undertaking to prove that Weir knowingly defrauded his purchasers, the government, at trial for the first time, astonishingly relied exclusively upon a proposed application of the doctrine of affirmative collateral estoppel. The government neither pled nor gave any advance warning of its dependency on collateral estoppel. Nothing akin to issue preclusion was hinted at in the pre-trial order as the government's means, much less as its only means, of proving this essential element. Rule 8(c), F.R.Civ.P., uses the mandatory word "shall." This rule requires that any party who plans to rely on issue preclusion must invoke that principle formally and must allege minimum facts to form a basis for it. Rule 8(c) grants no exception for the IRS or for any other branch of government. It applies to all litigants alike.

Rule 16(e), F.R.Civ.P., took over in this case where Rule 8(c) left off. This rule provides that the final pre-trial order "shall control the subsequent course of the action unless modified by a subsequent order." The government never asked this court for a modification of the pre-trial order to allow it to interpose collateral estoppel, and the pre-trial order was never amended to allow it. Finally, the pre-trial order not only made no mention of collateral estoppel, but it specifically required the parties on or before April 14, 1989, to exchange *"and file with the court"* lists of their documentary evidence. (emphasis supplied). The pre-trial order further provided that if a party fails to comply with the order it *"shall be precluded from offering as substantive evidence any exhibit not so identified."* (emphasis supplied). The record reflects no compliance with this provision of the pre-trial order by the government. Copies of the Alabama state court criminal proceedings against Weir were conspicuously not listed. Again, the government enjoys no exemption from the Federal Rules of Civil Procedure.

Because the fact that Weir had been convicted in an Alabama state court of securities fraud was presented at trial by the government in clear violation of Rules 8(c) and 16(e), and of the pre-trial order, the court cannot consider that fact as proof of anything. This simply leaves the government without any evidence whatsoever of intentional fraud by Weir.

B. Assuming *arguendo* that the court can or should consider the government's collateral estoppel evidence despite the government's clear violations of Rules 8(c) and 16(e), what did the government's proof consist of? The government offered proof that under a multi-count indictment handed down by an Alabama grand jury, Weir was convicted of a number of violations of Alabama's securities laws by an Alabama petit jury. Many of these Ala-

bama counts charged the selling of "securities" without a license. These counts were totally collateral to the issues in this case. They bear no relation whatsoever to the issues in this case. Many of the Alabama counts did involve charges of fraud allegedly committed by Weir during his sales of the "securities," but the allegations in these counts, which track the language of Ala.Code § 8–6–17(2), a criminal statute which makes certain securities frauds a crime, are not even close to the language of § 6700(a)(2)(A). Most of the Alabama fraud counts charged that Weir *either* affirmatively misrepresented a material fact *or omitted a material fact.* Except for Counts XXII, XXX and XXXIII of the Alabama indictment, the adjudication of Weir's guilt by the Alabama petit jury did not purport to adjudicate that Weir *misstated actual subject matter even close to the misstatements contemplated by Congress in § 6700(a)(2)(A).* Admittedly, the adjudication of guilt under Counts XXII, XXX and XXXIII did indicate a finding by the Alabama jury that Weir intentionally and affirmatively misrepresented some material fact, *but not necessarily the limited kind of material fact described in § 6700(a)(2)(A),* which requires, in order for the penalty to be imposed, that the intentional misrepresentation be *"with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest."* There is no way to argue that these narrow, essential *federal* facts were addressed or decided by the Alabama jury.

■ In a nutshell, the concept of issue preclusion can only come into play when the issue is precisely the same in the prior case as it is in the case in which the concept is sought to be applied. The command of 28 U.S.C. § 1738 is for a federal court to look for the preclusive effect, if any, by virtue of a state court judgment, to the law of the state in which that judgment was entered. *Kremer v. Chemical Construction Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). Weir's conviction here was in *Alabama.* The Alabama law on

issue preclusion under these precise circumstances is clearly stated in *Fidelity–Phenix Fire Ins. Co. of New York v. Murphy,* 226 Ala. 226, 146 So. 387 (1933). There the Alabama Supreme Court, in an opinion from which it has never since deviated, said:

> The conviction of the criminal charge is held in this state not to be conclusive of the fact of which he was convicted when such fact is an issue in a civil case, in which the state or government securing the conviction is not a party.

*Id.* 146 So. at 392.

To like effect is *Loper v. State,* 469 So.2d 707 (Ala.Cr.App.1985). In other words, even if the government's proof of the Alabama conviction could have been received as evidence, it had no preclusive effect under the law of Alabama, which is controlling on this count.

In its brief the government relies upon *United States v. Podell,* 572 F.2d 31 (2d Cir.1978), and *Deweese v. Town of Palm Beach,* 688 F.2d 731 (11th Cir.1982). These reliances are misplaced. Neither of these cases stands for the proposition that a prior adjudication can be interpreted and applied more expansively than its narrowest diameter. *Podell* talks about the *United States'* right in a subsequent civil suit to use *as evidence* a prior criminal conviction obtained as the result of a prosecution *by the United States.* Not only were the parties the same in *Podell,* but the issue was identical. Neither the parties nor the issues are identical in the instant case. *Deweese* not only expressly acknowledges that in order for collateral estoppel to be available to a litigant in a subsequent case it is necessary "that the issue at stake be identical to the one involved in the prior litigation," but the Eleventh Circuit there acknowledged the obvious, namely, that "special problems attend the application of offensive collateral estoppel." *Deweese,* 688 F.2d at 733. In neither *Podell* nor *Deweese* was the *Alabama* law of issue preclusion applied.

There is one more small problem inherent in the government's collateral estoppel theory. The attempt to ride on the Ala-

bama conviction runs into the so-called "*Petite*" policy adopted by the Department of Justice, referred to in *Petite v. United States*, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). Shortly after *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), which held that a federal penalty can be imposed on a person for the same conduct which had previously resulted in the imposition of a state penalty upon him, the Attorney General issued a memorandum, binding on all United States Attorneys, instructing them not to prosecute in instances where there has previously been a successful state prosecution if the state prosecution was based on the same facts forming the basis for imposing a federal penalty. This federal public policy applies *except* where a deviation from it is expressly approved in writing by an Assistant Attorney General. The government here proved no such express authorization for an exception from the "*Petite*" rule as to Weir. Perhaps there is an exception for tax penalties.

C. Weir's credibility as a witness, and the significance of the circumstantial evidence, only come into play if the government has somehow dodged the bullets aimed by Rules 8(c) and 16(e) and by *Fidelity–Phenix*.

■ This court finds that Weir was naive, perhaps stupid, to believe the sales pitch made to him by Mid–South's entrepreneurs, but this court also finds that Weir neither actually realized, nor had reason to believe in 1982 and 1983, that what he was representing to his 34 customers by way of purportedly favorable tax consequences was, in fact, false. The Mid–South scheme may have been almost too good to be true, but it had a semi-logical basis in the then tax laws, which permitted, even encouraged, schemes not unlike this one. Weir was obviously overwhelmed by the tax saving possibilities for his higher-bracket clients. He may also have been carried away by the potential for personal profit, but he did believe the lengthy and weighty legal opinion dated December 18, 1980, rendered by Wolfson & Wolfson, Ohio attorneys, asserting that this shelter was effica-cious. If Weir became a con-artist, he only became one because he had himself been successfully conned by Mid–South. He did not, in fact, have the requisite understanding that he was misrepresenting favorable tax consequences. He lacked the "intent" to misstate the tax consequences.

Not until September 20, 1985, did the United States District Court for the Middle District of Tennessee in *United States v. Mid–South Music Co.*, 624 F.Supp. 673 (M.D.Tenn.1985), adjudicate that Mid–South, in fact, constituted an abusive tax shelter. On that date Mid–South was first enjoined from overvaluing its "master music recordings" and from misrepresenting those overstated values to the buying public eager to seek a reduction in their income taxes. The Tennessee federal court decision, coming from the heart of music country, put the world, including Weir, on notice that Wolfson & Wolfson's opinion was flawed, *but all of the transactions made the basis of this particular assessment took place in 1982 and 1983*, long before the *Mid–South Music* opinion became public knowledge. It is of passing interest that four days after *Mid–South Music* the United States District Court for the Middle District of Tennessee in another *Mid–South Music* case read the riot act to the IRS for breaching taxpayer confidentiality by writing letters to taxpayers warning them about Mid–South's particular sham shelter. *Mid–South Music Corp. v. United States*, 1985 WL 3673 (M.D.Tenn. Sept. 24, 1985).

Because the government has no viable collateral estoppel theory, and because the court finds credible Weir's denial of any actual intent to deceive, the court finds that the United States failed to meet its burden of proving by a preponderance of the evidence the requisite intent by Weir to misrepresent the tax consequences of a purchase of the Mid–South tax shelter.

### Another Fatal Defect in the Government's Case

■ There is another crucial question which the IRS has not answered. It has no answer. In the pre-trial order the government asserts that Weir "made 35 [sic] sales

to individual investors of interests in Mid-South Music Corporation during 1982 and 1983, and he received $26,914.83 as his share of the income from these sales." The government offered no evidence to indicate which of the 34 sales, if any, were made *prior to September 3, 1982*, the effective date of § 6700. The burden of proof was always on the government. The government simply failed to prove the amount of Weir's gross income derived from sales made *after* this particular statute went into effect. The court cannot speculate or guess about this. For aught appearing, most, if not all, of Weir's sales in 1982 *preceded* September 3, 1982. This imprecision in its proof makes a finding in favor of the government impossible.

### Yet Another Fatal Defect in the Government's Case

█ How did the United States arrive at the figure, $34,000.00, which it gratuitously reduced to $26,914.83? The current statute provides only one possible penalty: a "penalty *equal to* the *greater* of $1,000 *or* 20 percent of the gross income derived or to be derived by such person from *such activity.*" 26 U.S.C. § 6700(a) (emphasis supplied). The statute does *not* provide an alternative in the amount of *$1,000 for each sale* of an investment, much less for another alternative in the amount of the seller's entire gross income (the alternative invented by the IRS for Weir's case). The only penalty mentioning $1,000.00 is the *single figure*, $1,000.00, that is, if $1,000.00 is more than 20% of the gross income from the entire "activity."

In *United States v. Grinkiewicz*, 873 F.2d 253 (11th Cir.1989), the Eleventh Circuit recently dealt with an analogous penalty statute. There the Eleventh Circuit held that the possession of *six* weapons constituted only *one* offense and that the govern-

ment could not bring six separate charges, one per illegal weapon possessed. While analyzing Weir's case, the IRS did not have on its best pair of statutory reading glasses. It could not read § 6700 to call for a penalty of $1,000.00 for each separate sale of the same alleged abusive tax shelter.[1]

### Yet Another Fatal Defect in the Government's Case

█ Even if the higher penalty were a percentage of the total income from the entire "*activity*" in 1982 and 1983 (the tax years here in question), § 6700 at that time called for a penalty of *10%* rather than the present *20%*. The statute was amended on July 18, 1984 to increase the penalty from 10% to 20%. If the IRS impliedly suggests the imposition of a 20% penalty upon Weir's activity in 1982 and 1983, it would constitute an *ex post facto* application of the 1984 amendment and would violate Article I, Section 9 of the Constitution. Therefore, the *maximum* theoretical penalty here, as a percentage of "gross income," was $2,691.48 and not the $5,382.96 erroneously computed by Weir himself. Weir needed an accomplished statute reader, but so did the government.

### Yet Another Fatal Defect in the Government's Case

█ Weir's undisputed evidence was that he was forced by the State of Alabama as a part of his victim restitution obligation to return to all of his purchasers the full amounts of his several commissions from the sales of "securities." Thus, did he have any "gross income" from his illegal "activity"? Construing a penalty statute against the government, as the court must do under *Bifulco v. United States*, 447 U.S. 381, 100 S.Ct. 2247, 2249, 65 L.Ed.2d 205 (1980), Weir no longer enjoyed any income whatsoever from his sales of these

---

1. By serendipity, and without LEXIS or WESTLAW, just in time to add this footnote, this court read *Gates v. United States*, 874 F.2d 584 (8th Cir.1989). Would that the IRS had been able to read *Gates* before it decided to assess Weir. In *Gates*, the Eighth Circuit flatly rejected the IRS contention that Congress intended in § 6700 to impose a separate penalty of $1,000.00 for each organization of an abusive tax shelter or for each sale of an interest in such a shelter. When it assessed Weir, the IRS may not have anticipated the Eighth Circuit, but it had available *Spriggs v. United States*, 660 F.Supp. 789 (E.D. Va.1987), which held the same thing. In its brief in support of its Rule 56 motion, the IRS cited *Waltman v. United States*, 618 F.Supp. 718 (M.D.Fla.1985), with which this court respectfully disagrees.

tax shelters after the state took it away. Ten percent or twenty percent of zero is zero. Alabama succeeded in causing Weir to disgorge his ill gotten gains. This left him with no ill gotten gains to disgorge under IRS attack. Therefore, the maximum penalty which could be assessed here is $1,000.00, the lesser penalty. The IRS apparently could not get excited over $1,000.00, so aggressive enforcement was the mother of invention.

### Yet Another Fatal Defect in the Government's Case

 This penalty statute, necessarily construed in favor of the person who was the object of the prospective penalty, required the government to prove a misrepresentation of the tax consequences in each and all of the 34 sales that the IRS contends were violations of § 6700. If, *arguendo*, the government had proven such a specific misrepresentation in only one of the 34 sales (something it failed to do), this fraud could not be attributed inferentially to all of the other sales. The government made no attempt to break down Weir's $26,914.83 in gross commissions among the 34 sales, and made no attempt to prove what Weir actually said to each separate purchaser. The IRS cannot treat Weir's commissions or sales as a lump, all infected with a common fraud.

### One Last Fatal Defect in the Government's Case

Coming full circle, there is no acceptable rationale for the purported assessment of $26,914.83. Any arbitrary and capricious tax assessment, without any statutory basis, is void *ab initio*. The IRS in this case has undertaken the burden of justifying the unjustifiable. Its only explanation must be that it decided to do a little legislating of its own in the name of justice, something even the courts are not supposed to do. Congress does the legislating for this country.

### *Conclusions of Law*

This court has jurisdiction pursuant to 26 U.S.C. § 6703(c)(1), (2).

Weir is entitled to the refund of the $807.44 which he paid to the IRS as a prerequisite to the filing of this suit. He has no liability whatsoever to the United States for any penalty under 26 U.S.C. § 6700. The government simply failed to meet its burden of proving all elements necessary for the imposition of a penalty, either in the specific amount it attempted to assess, or in any other amount.

An appropriate, separate order will be entered.