UNITED STATES of America,
Plaintiff–Appellee,

v.

ESTATE PRESERVATION SERVICES,
a Trust; Estate Preservation Services,
Inc.; Robert L. Henkell, Defendants–
Appellants.

United States of America,
Plaintiff–Appellee,

v.

Estate Preservation Services,
a Trust, Defendant,

and

William F. Sefton, Defendant–
Appellant.

Nos. 98–17220, 98–17297.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1999

Filed Jan. 25, 2000

Joe Alfred Izen, Jr., Bellaire, Texas, for defendants-appellants Estate Preservation Services, A Trust; Estate Preservation Services, Inc.; and Robert J. Henkell.

John R. Vaught, Vaught & Boutris, Oakland, California, for defendant-appellant William L. Sefton.

Jonathan S. Cohen and Joan I. Oppenheimer, Tax Division, United States Department of Justice, Washington, D.C., for plaintiff-appellee.

Before: SNEED and PREGERSON, Circuit Judges, and CARTER,[1] District Judge.

SNEED, Circuit Judge:

We must decide the appropriateness of a preliminary injunction entered against the promoters of certain tax shelters. The United States filed suit in 1997 against Estate Preservation Services, a Trust; Estate Preservation Services, Inc.;[2] Robert L. Henkell; and William L. Sefton ("Appellants"). Injunctive relief was sought under Title 26 United States Code Section 7408 to prevent Appellants from rendering abusive tax-shelter advice under Title 26 United States Code Section 6700. The district court granted a preliminary injunction in October 1998.[3] Independent appeals were timely filed and subsequently

---

1. The Honorable David O. Carter, United States District Judge for the Central District of California, sitting by designation.

2. For ease of reference, we will refer to Estate Preservation Services, a Trust, and Estate Preservation Services, Inc., as "Estate Preservation Services."

3. The preliminary injunction states:
 [Appellants] and their respective officers, directors, employees, attorneys, and agents are hereby enjoined and restrained, pending trial and judgment in this court or further orders herein, from:
 1. organizing, promoting, marketing, or selling "Asset Preservation Trusts," "Estate Management Trusts," and any other abusive tax shelter, plan, or arrangement which advises or encourages taxpayers to attempt to violate internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities; and
 2. organizing, selling, or assisting in the organization of an entity or otherwise promoting any plan or arrangement based upon:
 A. the representation that property can be transferred into a trust by a taxpayer at no cost to the trust, for "units of beneficial interest" or otherwise, giving the trust a higher basis in the equipment than available to the taxpayer;
 B. the representation that equipment transferred to a trust by a business can be leased back to the business at inflated rates thereby transferring income from

consolidated *sua sponte* by this court. Jurisdiction exists under Title 28 United States Code Section 1292(a)(1).

 A district court's grant of a preliminary injunction is subject to "'limited review.'" *FTC v. Affordable Media, LLC,* 179 F.3d 1228, 1233 (9th Cir.1999) (quoting *Does 1–5 v. Chandler,* 83 F.3d 1150, 1152 (9th Cir.1996)). This court will therefore reverse a district court only when the lower court has committed an abuse of discretion. *Id.* An abuse of discretion occurs when a court bases its decision on an erroneous legal standard or on clearly erroneous factual findings. *Id.*

The record on appeal indicates that the district court did not abuse its discretion by issuing the preliminary injunction against Appellants. We therefore affirm.

## I.

Appellant Estate Preservation Services ("EPS") was in the business of marketing trusts and other asset protection devices. In 1992 EPS began vending irrevocable non-grantor trusts which it called "Asset Preservation Trusts" ("APTs"). EPS sold these APTs through a nationwide, multilevel marketing network of financial planners.

Appellant Robert L. Henkell was the central figure in promoting and organizing the activities of EPS. In this capacity, Henkell spawned a variety of trust entities, including the APT. He published a training manual entitled "Asset Preserva-tion Trusts (APT)—Description, Use & Benefits" ("APT Manual") to market the APT. The APT Manual made numerous representations about the permissibility of tax deductions and credits purportedly available to APTs. Henkell also conducted seminars during which he advised individuals on how to create and use APTs to generate tax deductions and reduce tax liability.

Appellant William L. Sefton is a Certified Public Accountant who was held out as an "executive vice president" of EPS. Sefton received his Masters in Accounting from the University of Southern California in 1966 and was licensed as a Certified Public Accountant for nearly 30 years before the government filed this action. Sefton has described his practice as "primarily that of preparing income tax returns for individuals." He has claimed throughout this case to have had no expertise in the field of trust taxation. Nonetheless, Sefton spoke at EPS programs about living trusts and recruited to EPS thirty sales agents, some of whom sold APTs. EPS compensated Sefton in the form of a "sales override" on each of the three occasions that his recruits sold an APT.

The Internal Revenue Service ("IRS") learned of APTs while auditing individual taxpayers in 1995. The IRS determined that APTs were tax shelters designed to claim excessive and/or improper deductions. It formally assessed penalties of $1.254 million each against Henkell and EPS pursuant to Section 6700[4] of the In-

---

the business to the trust for purposes of avoiding taxes;

C. the representation that personal expenses can be paid by a trust in order to obtain tax benefits not available to individuals;

D. the representation that owner-occupied personal residences of taxpayers can be transferred to a trust and then depreciated as a business asset; and

E. the representation that individual taxpayers can deduct contributions made to their own charities and later disburse the funds back to themselves or their families.

4. Section 6700, which proscribes abusive tax shelters, states in relevant part:

(a) Imposition of penalty.—Any person who—

(1)(A) organizes (or assists in the organization of)—

. . .

(ii) any investment plan or arrangement, or

. . .

(B) participates (directly or indirectly) in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes or causes another person to make or furnish (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the

ternal Revenue Code.[5]

Shortly after these penalties were levied, Henkell began marketing "Estate Management Trusts" ("EMTs") in lieu of "Asset Preservation Trusts." He modified the APT Manual to conform to this new EMT program. Henkell also formed the New Dynamics Foundation ("NDF"). NDF materials stated that a taxpayer could reduce his or her tax burden through forming private charitable foundations. The government alleged in its complaint that Henkell created the EMTs and NDF to mask illegalities and to further evade the properly applicable tax law. It was also averred that Sefton facilitated tax shelter abuses associated with NDF, which he helped Henkell to found.

## II.

▮▮▮ Congress added the statutory provisions that apply to this litigation, I.R.C. Sections 6700 and 7408, as part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248, 96 Stat. 324. The government must prove five elements to obtain an injunction under these statutes: (1) the defendants organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) they made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) they knew or had reason to know that the statements were false or fraudulent; (4) the false or fraudulent statements pertained to a material matter; and (5) an injunction is necessary to prevent recurrence of this conduct. I.R.C. §§ 6700(a), 7408(b). The government bears the burden of proving each element by a preponderance of the evidence. *United States v.*

*H & L Schwartz,* 1987 WL 45223, at *6 (C.D.Cal.1987), *aff'd sub nom, Bond v. United States,* 872 F.2d 898 (9th Cir.1989). The traditional requirements for equitable relief need not be satisfied since Section 7408 expressly authorizes the issuance of an injunction. *Trailer Train Co. v. State Bd. of Equalization,* 697 F.2d 860, 869 (9th Cir.), *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); *United States v. Buttorff,* 761 F.2d 1056, 1059 (5th Cir. 1985).

Each Appellant claims that the government failed to prove the above elements. We will consider their arguments separately since Henkell and EPS take somewhat different approaches in their briefs than does Sefton. Finally, we will address whether the preliminary injunction to any extent is in conflict with the First Amendment.

### A. *Henkell and EPS*

Henkell and EPS do not deny organizing or selling, or participating in the organization or sale of, an entity, plan, or arrangement. They do not deny that their words would have been materially fraudulent if they misrepresented the tax consequences of these devices. Further, they do not deny that their conduct, if prohibited by Section 6700, would likely recur and that injunctive relief would be a necessary precaution.

Henkell and EPS do contend, however, that: (1) they did not promote any abusive tax shelters by making false statements about United States tax law; and (2) even if they did make false statements, they never knew or had reason to know that those statements were untrue, *i.e.,* they

excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter,

. . .

shall pay, with respect to each activity described in paragraph (1), a penalty equal to. . . .

26 U.S.C. § 6700 (West 1999).

**5.** Unless otherwise indicated, all statutory references are to the Internal Revenue Code, codified at Title 26 of the United States Code ("I.R.C."). This appeal does not involve the penalties imposed against Henkell and EPS.

did not act with the requisite scienter under Section 6700.

We conclude in section 1 *infra* that the promotion statements were false, and in section 2 *infra* that Henkell and EPS uttered the statements with the scienter necessary to violate Section 6700.

### 1. *The False Tax Advice*

The district court determined that Henkell and EPS made at least four misrepresentations about the purported tax benefits of APTs, EMTs, and donor-directed foundations. These misrepresentations concerned: (1) the basis of property placed in trust; (2) the strategy of "upstreaming" income; (3) the deductibility of personal expenses and the depreciation of an owner-occupied home; and (4) the deductibility of certain donations to donor-directed charitable foundations.

■ Henkell and EPS argue that no specific evidence of any EPS customers violating United States tax laws was ever adduced. They miss the point. Section 6700(a)(2)(A) penalizes *promoters*, like Henkell and EPS, who knowingly utter false statements with respect to certain tax matters. Whether EPS customers used that misinformation to violate the law is irrelevant. Congress intentionally omitted taxpayer reliance as an element of the offense. *See* S. REP. NO. 97–494, vol. 1 at 268 (1982), *reprinted in* 1982 U.S.C.C.A.N. 781, 1916.

With this in mind, we turn to the four primary areas of Appellants' fraudulent conduct and to the conclusions reached by the district court.

### (a) *Step-up in Basis of Property Placed in Trust*

■ The APT manual represented that taxpayers could transfer equipment into an APT at no cost to the trust, and thereby give the trust a higher basis in the equipment than it had in the hands of the taxpayer. The district court did not commit clear error in holding these statements to be fraudulent.

■ I.R.C. § 1015 governs the basis for property acquired by gifts and by transfers in trust. Section 1015(b) provides:

> If the property was acquired after December 31, 1920, by a transfer in trust ..., *the basis shall be the same as it would be in the hands of the grantor* increased in the amount of gain or decreased in the amount of loss recognized to the grantor on such transfer under the law applicable to the year in which the transfer was made.

I.R.C. § 1015(b) (West 1999) (emphasis added). This section expressly precludes a taxpayer from acquiring a fair market value basis for property by merely transferring it to a trust. As the statute provides, the basis for property transferred in trust "shall be the same as it would be in the hands of the grantor." *Id.* Thus, an APT would not then be at liberty to, as the APT Manual represented, "start depreciation over" on property transferred to it by an EPS customer.

Henkell and EPS argue that I.R.C. Section 644 (West 1986) (repealed by Pub.L. 105–34, Title V, § 507(b)(1), Aug. 5, 1997, 111 Stat. 857) [6] should be read in conjunc-

---

6. This statute stated in relevant part:

§ 644. Special rule for gain on property transferred to trust at less than fair market value
(a) Imposition of tax.—
(1) In general.—If—
(A) a trust (or another trust to which the property is distributed) sells or exchanges property at a gain not more than 2 years after the date of the initial transfer of the property in trust by the transferor, and
(B) the fair market value of such property at the time of the initial transfer in

trust by the transferor exceeds the adjusted basis of such property immediately after such transfer,
there is hereby imposed a tax determined in accordance with paragraph (2) on the includible gain recognized on such sale or exchange.
(2) Amount of tax.—The amount of tax imposed by paragraph (1) on any includible gain recognized on the sale or exchange of any property shall be [calculated at the contributor's marginal rates]....

tion with Section 1015 because Section 644 would have been "the law applicable to the year in which" the APT Manual urged transfers to APTs. However, Section 644 did not create a structure consistent with the representations of Henkell and EPS. Instead, it related to taxing the trust on the gain from its sale of property that had been transferred to it at *less* than fair market value. Congress designed Section 644 "to cover the possible abuse where the grantor places in trust property which has unrealized appreciation in order to shift the payment of tax [on sale] to the trust at its lower progressive rate structure." STAFF OF JOINT COMM. ON TAXATION, 94TH CONG., GENERAL EXPLANATION OF THE TAX REFORM ACT OF 1976 (Comm. Print 1976) at 162, *reprinted in* 1976–3 C.B. (col.2) 1, 174. Section 644 is not applicable when the basis of such trust property was its fair market value at the time of transfer. The basis of property transferred to an APT must be determined without regard to Section 644.[7]

■ Henkell and EPS also informed APT users that I.R.C. Section 1031 would likely allow a "stepped up" basis in equipment that was transferred to an APT in exchange for so-called "Units of Beneficial Interest" ("UBIs"). This was false. It is true that Section 1031(d) provides that the basis of property acquired in a like-kind exchange under Section 1031(a)(1) "shall be the same as that of the property exchanged." However, Section 1031 expressly excludes from this provision property that is exchanged for "certificates of trust or beneficial interests." I.R.C. § 1031(a)(2)(E). The district court found the UBIs to be "materially indistinguishable from 'certificates of beneficial interest.'" Consequently, an exchange of UBIs for property that has a basis less than its fair market value does not cause that prop-

erty to acquire a new basis equal to its fair market value. The district court did not err in finding Henkell and EPS's representations about the impact of Section 1031 to be false.

(b) *"Upstreaming" Income by Means of "Created Cost" of Earning Such Income*

■ EPS materials also asserted that business income could be "upstreamed" by transferring business supplies and services to an APT which would then sell them back to the business at a significant markup. Presumably, this increased the "cost" of those supplies and services. It does not work. All trade or business deductions must be "ordinary and necessary" and reasonable in amount under I.R.C. Section 162(a). *United States v. Haskel Engineering & Supply Co.*, 380 F.2d 786, 788–89 (9th Cir.1967) (noting that ordinary and necessary expenditures are not deductible to extent they are unreasonable in amount). Courts have construed Section 162(a) to frustrate collusive mark-ups designed solely to gain a tax advantage. *See, e.g., Audano v. United States*, 428 F.2d 251, 256–57 (5th Cir.1970) (trusts to which doctor transferred for the benefit of his children his undivided interest in supplies and in medical and surgical equipment, and to which his medical partnership thereafter paid rent for use of this property, were "nullities" for tax purposes); *B. Forman Co. v. Commissioner*, 453 F.2d 1144, 1160 (2nd Cir.), *cert. denied*, 407 U.S. 934, 92 S.Ct. 2458, 32 L.Ed.2d 817 (1972) ("The test for determining deductibility is whether a hard-headed businessman, under the circumstances, would have incurred the expense").

■ Henkell and EPS note correctly that no section of the Code expressly pro-

---

7. Section 644(a) was repealed in 1997. Pub.L. 105–34, Title V, § 507(b)(1), Aug. 5, 1997, 111 Stat. 857. At that time other provisions had slowed substantially the potential tax reduction arising from taxation at the trust level rather than the beneficiary or contributor level. *See* Tax Reform Act of 1986,

Pub.L. 99–514, Title I, Subtitle A, § 101(a), Oct. 22, 1986, 100 Stat. 2085 (reducing maximum tax benefit of graduated rate structure applicable to trusts); Tax Reform Act of 1984, Pub.L. 98–369, Div. A, Title I, Subtitle F, § 82, Jul. 18, 1984, 99 Stat. 494 (curtailing tax avoidance use of multiple trusts).

hibits a person from forming a trust, transferring business assets to it, and then renting back those assets. It is the "mark up" that creates the problem. The law forbids deductions for payments where the obligation to pay "resulted not as an ordinary, necessary incident in the conduct of the taxpayer's business, but instead was created solely for the purpose of effectuating a camouflaged assignment of income." *Audano*, 428 F.2d at 256–57; *see also B. Forman*, 453 F.2d at 1160 (citing *Audano* ).

 Efforts to divest income from its proper source are not uncommon. The district court properly observed that "the clear import of the 'upstreaming' technique as described in the APT Manual to be that money can be moved between related entities solely to gain a tax advantage." Unpublished Memorandum of Decision and Order (Oct. 5, 1998), 11. The effort, however, does not generate "ordinary and necessary" business expenses within the meaning of Section 162(a). It follows that the district court did not err when it determined that the EPS materials made false statements advocating the deduction of non-ordinary, unnecessary, and unreasonable expenses.

### (c) Deduction of Personal Expenses; Depreciation of an Owner-occupied Home

 Henkell and EPS also represented that a taxpayer could deduct utility and maintenance expenses associated with a personal residence, as well as claim depreciation deductions thereon, by transferring the property to an APT. Taxpayers frequently seek to convert non-deductible consumption expenditures into deductible expenses.

Placing an owner-occupied home into an APT, however, does not transform the home into income generating property. All expenses related to the ownership ·of such a home remain personal expenses and are not deductible.[8] Nor does placing a personal residence in trust make it depreciable for tax purposes while the owner lives there. The Code only allows depreciation of property used in business or for the production of income. *See* I.R.C. § 167 (West 1999); *see also Sacks v. Commissioner*, 69 F.3d 982, 986 (9th Cir.1995) (finding sale-leaseback arrangement to be legitimate business activity and therefore allowing related depreciation deductions).

 To repeat, an owner-occupied home is not transformed into "property used in business or for the production of income" by virtue of its placement in an APT.

### (d) Deductions for Donations to Donor-directed Charitable Foundations

 Efforts to shelter income from taxation while retaining control of the income-producing assets are commonplace. Appellants marketed such a device. Appellants encouraged taxpayers to establish charities called "donor-directed foundations" with the expectation that doing so would enable the taxpayers to amass assets tax-free. NDF produced a brochure entitled "Description & Operation of Your Own Foundation" ("NDF Brochure") and a manual entitled "Operation Manual for a Donor–Directed Foundation" ("NDF Manual") to market these foundations. The district court held that these materials fraudulently communicated to NDF customers that they could establish charitable foundations solely for their own benefit.

---

**8.** *See* I.R.C. § 262(a) ("Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses."); *United States v. Buttorff*, 761 F.2d 1056 (5th Cir.1985) (holding trust which lacked the tax benefits marketed by its promoter, including the deductibility of personal consumption expenses associated with home ownership, to be a sham under Section 6700); *see also Grimes v. Commissioner of Internal Revenue*, 806 F.2d 1451, 1453 (9th Cir.1986) (noting nondeductibility of personal expenses and describing necessity of specific legislation authorizing deductions); *Neal v. Commissioner*, 681 F.2d 1157, 1158 (9th Cir. 1982) (emphasizing nondeductibility of personal expenses).

The district court based its decision on I.R.C. Section 170, *United States v. American Bar Endowment*, 477 U.S. 105, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986), and *Pollard v. Commissioner*, 786 F.2d 1063 (11th Cir.1986). Section 170, which makes charitable contributions generally deductible, defines them as a contribution or a gift to or for the use of:

> A corporation, trust, or community chest, fund, or foundation—
>
> > (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals;
> >
> > (C) *no part of the net earnings of which inures to the benefit of any private shareholder or individual*
> > . . . .

§ 170(c)(2) (West 1999) (emphasis added). In *American Bar Endowment*, the Supreme Court held that "[a] payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." 477 U.S. at 116–17, 106 S.Ct. 2426. In *Pollard*, the Eleventh Circuit held that a donor must have surrendered dominion and control over the gift for it to qualify as a charitable contribution. 786 F.2d at 1067. *See also Hernandez v. Commissioner*, 490 U.S. 680, 690, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989) (expectation of "quid pro quo" defeats deductibility of contribution).

The evidence strongly suggests that the grantor of a donor-directed foundation could expect to retain significant dominion and control over the assets deposited therein. An EPS newsletter described the scheme as "the perfect way for your client to warehouse wealth" and as a "safety net" that could provide employment to donors and their families. Henkell marketed the foundations as a way for "donors" to avoid taxation, build a large portfolio, and still retain control of the "donor's" money. The NDF Brochure even advertised do-nor-directed foundations as a means to "continued income during the retirement years." All a donor had to do to access his or her "warehoused" wealth was to submit a so-called expenditure "request." The record suggests that only one of these "requests" was ever rejected and that the "charitable use" of disbursed funds was never verified.

NDF and EPS literature improperly suggested that for tax purposes charity begins at home. Such motivated deductions for "donations" to these foundations would not yield the results claimed. Consequently, the district court did not abuse its discretion by enjoining Henkell and EPS from making such unsupportable claims.

#### (e) *Government's Burden of Proof*

Henkell and EPS argue that the district court: (1) impermissibly "rejected the teachings" of *United States v. Dahlstrom*, 713 F.2d 1423 (9th Cir.1983) (criminally charging defendants with, *inter alia*, violating I.R.C. Section 7206(2) for their role in promoting abusive tax shelters), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1984); and (2) lacked "all authority for its interpretation" that proving the Section 6700(a)(2)(A) "knew or had reason to know" element would be less burdensome than proving the Section 7206(2) willfulness element. We reject the argument.

The district court correctly distinguished the "knew or had reason to know" element of Section 6700(a)(2)(A), which is provable by a preponderance of the evidence, from the willfulness element under Section 7206(2), which is provable beyond a reasonable doubt. *Dahlstrom* was a criminal case. This case is not. Therefore, the district court correctly applied the preponderance of the evidence standard.

#### 2. *Scienter*

■■■■ In addition to challenging the district court's conclusion that they made

false statements, Henkell and EPS insist that they never knew or had reason to know that the statements were false. We shall apply the following factors in determining whether a particular defendant had the requisite scienter to violate Section 6700: (1) the extent of the defendant's reliance upon knowledgeable professionals; (2) the defendant's level of sophistication and education; and (3) the defendant's familiarity with tax matters. *See United States v. Kaun,* 827 F.2d 1144, 1149 (7th Cir.1987). The record in this appeal suggests that in the district court the government more than adequately established with respect to each defendant all three factors.

(a) *No Reliance on "Professionals"*

Both Henkell and EPS claim that Henkell relied upon "professionals including attorneys and certified public accountants" when he developed and marketed the APT concept. This defense is suspect. The one lawyer who discussed the APT concept with Henkell apparently disagreed with him, believing that property placed into an APT would assume the donor's basis. Further, the two professionals who allegedly advised Henkell regarding NDF and donor-directed foundations were neither deposed nor called as witnesses. Only Henkell testified to their qualifications and their advice. The district court determined that Henkell chose to ignore those who were "skeptical as to the legality of his statements" and to "associate" with those who "unquestioningly agreed to further his scheme."

(b) *Level of Sophistication and Education*

Henkell is well-educated and familiar with tax matters, including the law impli-

cated in his APT and NDF schemes. He held an advanced degree in physics and had completed course work for an advanced degree in computer science. Henkell also received training at the University of Southern California Law School in the field of taxation. The record and Henkell's own testimony substantiate his facility with various elements of the Internal Revenue Code.

The House Conference Report accompanying TEFRA indicates that the "reason to know" standard of Section 6700(a)(2)(A) "allow[s] imputation of knowledge so long as it is commensurate with the level of comprehension required by the speaker's role in the transaction." *United States v. Campbell,* 897 F.2d 1317, 1321–22 (5th Cir.1990) (analyzing H.R. Conf. Rep. No. 97–760, at 572 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1190, 1344). The "knew or had reason to know" standard therefore includes " 'what a reasonable person in the [defendant's] ... subjective position would have discovered.' " *Id.* (quoting *Sanders v. United States,* 509 F.2d 162, 166 (5th Cir.1975)). This was clearly the standard the district court applied when it concluded: "After listening to Henkell's testimony, and in light of his level of education and his familiarity with tax issues, this court concludes that he either knew or had reason to know of the falsity of the statements he was making." The district court did not clearly err in drawing this conclusion.[9]

B. *Sefton*

Sefton challenges the district court's findings that, as required by Section 6700: (1) he participated in the organization of a tax shelter; (2) he furnished the fraudulent statements; (3) he knew or had rea-

---

**9.** The district court incorrectly mentioned that Henkell had an "obligation to further investigate the legitimacy of the representations made in the APT Manual and in the NDF materials." The House Conference Report makes it clear that the "knew or had reason to know standard" does not include a duty of inquiry. H.R. Conf. Rep. No. 97–760, at 572 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1190, 1344. However, the district court ultimately applied the correct legal standard, *see Campbell,* 897 F.2d at 1321–22, when it determined that Henkell and EPS "knew or had reason to know" that their statements were fraudulent.

son to know that the statements were false; and (4) his conduct is likely to recur. Sefton has adopted those portions of the Henkell and EPS brief which concern whether the representations of tax benefits were false and, if so, whether they were material.

### 1. *Participation in Organization*

■ Sefton completely denies organizing and participating in EPS. He makes a number of arguments to support this claim. First, he insists that he spoke at EPS's public events solely on the subject of revocable living trusts, his area of expertise. Second, he contends that his position as EPS "executive vice president" was only a "marketing title" and that he was an "independent contractor." Third, he claims that he intended for the thirty agents he recruited to EPS to sell only revocable living trusts. This was, Sefton urges, because he saw no market for APTs. Finally, Sefton argues that he did not know until this litigation that he received any benefit from the sale of APTs by the agents he recruited to EPS. The $1900 in APT sales overrides that he collected from these agents was spread throughout a three year period.

We are not convinced. Section 6700 states explicitly that whoever "participates (directly *or indirectly* )" in promoting an abusive tax shelter is subject to potential penalties. I.R.C. § 6700(a)(1)(B) (emphasis added). Congress added this language as part of the Omnibus Budget Reconciliation Act of 1989. Pub.L. 101–239, § 7734(a)(1)(B) (inserting "(directly or indirectly)" following "participates" in Section 6700(a)(1)(B)). While no prior case appears to have addressed the import of these added words, their plain meaning indicates that even one who "indirectly" participates by recruiting agents who market an abusive tax shelter may be liable under Section 6700.

Before Congress added this language, several courts had determined that tax shelter representatives could violate Section 6700 where they recruited salespersons and received commissions as a result

of such persons' sales. *See Gates v. United States,* 874 F.2d 584, 585–86 (8th Cir. 1989) (upholding liability of promoter who recruited others to market abusive tax shelters); *Reno v. United States,* 717 F.Supp. 1198 (S.D.Miss.1989) (finding that defendant "unequivocally participated" in sales of abusive tax shelters when he "recruited salesmen ... and provided promotional and tax information to salesmen and tax preparers who, as conduits, passed that information along to [purchasers]"); *Agbanc, Ltd. v. United States,* 707 F.Supp. 423, 427 (D.Ariz.1988) (stating that "a person or entity cannot insulate itself from Section 6700 liability merely by employing salespeople who actually made the false statements"); *United States v. United Energy Corp.,* 1987 WL 4787 (N.D.Cal.1987) (stating that "[i]t would frustrate the congressional purpose if a person who funded an enterprise, acted as one of its officers and directors, and profited from it, could insulate him or herself merely by employing salespeople who actually made the false statements").

These cases and Congress's more recent addition of the "indirectly" language amply support the injunction against Appellants. The district court did not, given the record on appeal, clearly err in finding that Sefton indirectly participated in the APT fraud.

### 2. *Causation*

■ Sefton insists that his "indirect participation," if any, neither made nor "caused others to make," fraudulent statements with regard to the tax benefits of APTs or of charitable foundations. He argues that lending legitimacy to the company through his participation in EPS events could not establish causation under Section 6700(a)(2). He also insists that his participation in NDF was too tangential to support the district court's judgment.

We reject this contention. Sefton is too modest. The level of Sefton's involvement in EPS as an "executive vice president," a recruiter of sales agents, and a recipient of

sales overrides supports the determination that he, at minimum, "caused others to make" fraudulent statements. Both EPS and NDF published materials containing fraudulent information regarding tax benefits while Sefton was deeply involved. These materials were then given to sales agents for transmission to taxpayers. Sefton, as an NDF director, voted his approval of the NDF materials knowing that they would be distributed to donors. The district court on the basis of these facts did not abuse its discretion. *See United Energy,* 1987 WL 4787, at *12; *Agbanc,* 707 F.Supp. 423, 427 (D.Ariz.1988).

### 3. *Scienter*

██ The district court concluded that Sefton "knew or had reason to know" of the falsity of the statements made, per Section 6700(a)(1)(A). In doing this the court: (1) considered Sefton's testimony, which included a claim of justifiable reliance upon knowledgeable professionals; (2) evaluated his level of involvement with the APT scheme and NDF; and (3) weighed his level of education and professional background. The court did not commit error because there was ample evidence to support its conclusion and because it correctly applied the relevant law. *See Kaun,* 827 F.2d at 1149; *Campbell,* 897 F.2d at 1321–22.

Sefton cites *Weir v. United States,* 716 F.Supp. 574 (N.D.Ala.1989), in which a tax shelter promoter was found not to have violated Section 6700. The case is easily distinguishable. The *Weir* promoter possessed no significant tax law experience. 716 F.Supp. at 580. He appears to have relied upon a "lengthy and weighty" legal opinion by established experts in the field. *Id.* Given these facts, the *Weir* court concluded that the promoter could not have

known the law of charitable deductions, as was alleged. *Id.* Sefton, in contrast, was an experienced C.P.A. who had specialized in preparing individual tax returns for sixteen years before he helped to form NDF and voted his approval of the fraudulent NDF documents. Sefton could not help but be aware of Section 170, given his advanced training. Finally, unlike the defendant in *Weir,* Sefton never presented the corroborating evidence from the experts upon which he claims to have justifiably relied.

There was therefore no abuse of discretion.[10]

### 4. *Likelihood of Future Section 6700 Violations*

██ Factors that a court may consider in determining the likelihood of future Section 6700 violations and, thus, the need for an injunction include: (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation; (3) the defendant's degree of scienter; (4) the isolated or recurrent nature of the infraction; (5) the defendant's recognition (or non-recognition) of his own culpability; and (6) the likelihood that defendant's occupation would place him in a position where future violations could be anticipated. *See Kaun,* 827 F.2d at 1144–45; *Buttorff,* 761 F.2d at 1062; *SEC v. Holschuh,* 694 F.2d 130, 144 (7th Cir.1982).

██ The district court determined that the injunction was necessary for three primary reasons. First, Sefton's practice as a C.P.A. focusing on individual tax returns and audits made it likely that he would come into contact with other similarly abusive tax schemes. Second, Sefton had not taken any responsibility for his actions with NDF or EPS, and he repeatedly in-

---

**10.** The district court should not have verbalized Sefton's failure to investigate the claims about APTs. *See* H.R. CONF. REP. No. 97–760, at 572 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1190, 1344 (noting that Section 6700 does not establish a "duty of inquiry"). However, based on the evidence in the record, the district court did not abuse its discretion in

determining that Sefton "knew or had reason to know" of the falsity of the statements. A reasonable person in Sefton's subjective situation would have known or have had reason to know that the statements were false. *See Campbell,* 897 F.2d at 1321–22; *see also* n. 7, *supra* (reaching similar conclusion with regard to Henkell and the "duty of inquiry").

sisted he had no opinion as to the truth or falsity of the statements at issue. Third, the court was not persuaded by Sefton's "self-serving" statements that he would refrain from future fraudulent conduct. The court's findings were not clearly erroneous.

The record indicates that when Sefton chose to become involved with Henkell in NDF he possibly knew that the IRS was conducting an examination of EPS. He also very likely knew that Henkell had entirely rewritten the APT Manual and had discontinued selling APTs following the IRS audit notification. Sefton's participating in Henkell's NDF scheme under these circumstances indicates that he chose to ignore any of his own doubts about Henkell's questionable behavior. Considering the record on appeal, the district court did not clearly err when it determined that Sefton would likely violate Section 6700 again if unchecked. The preliminary injunction was therefore not an abuse of discretion.

### C. *First Amendment*

 Finally, the injunction does not violate the First Amendment to the United States Constitution. It proscribes only fraudulent conduct. Other courts have upheld similar Section 7408 injunctions in spite of First Amendment challenges. *See, e.g., Buttorff,* 761 F.2d at 1066; *Kaun,* 827 F.2d at 1150–52; *United States v. White,* 769 F.2d 511, 516–517 (8th Cir. 1985). The Fifth Circuit has declared:

> [W]here it has been determined that [a promoter's] statements regarding the tax benefits of his trust, which constitute commercial speech, are misleading in the context contemplated by Congress in enacting the statute, and the injunction prohibiting such statements is adequately tailored and construed to enjoin only such commercial speech which has been shown to be both misleading and likely to promote illegal activity, such repre-

sentations are not protected by the First Amendment. . . .

*Buttorff,* 761 F.2d at 1066.

The preliminary injunction in this case does not exceed the scope of what is necessary to forestall Appellants from further misrepresentations. Appellants may continue to publish legitimate tax planning advice, even regarding trusts. They are simply prohibited from advocating shelters that provide no legitimate shelter from lawful taxation. Every honest and qualified tax consultant knows the difference between legitimate and plainly illegitimate tax shelters. Appellants crossed the line into the "plainly illegitimate."

AFFIRMED.