UNITED STATES of America, Plaintiff,

v.

**L. Donald GUESS, et al., Defendants.**

**No. 04CV2184–LAB (AJB), 128.**

United States District Court, S.D. California.

July 1, 2005.

U.S. Attorney, U.S. Attorneys Office, Southern District of California, San Diego, CA, Stuart D. Gibson, United States Department of Justice, Washington, DC, for Plaintiff.

Darrell D. Hallett, John M. Colvin, Chicoine and Hallett, C. James Frush, Gordon Thomas Honeywell Malanca Peterson and Daheim, Seattle, WA, James N. Mastracchio, Miriam L. Fisher, Bruce Zagaris, Berliner Corcoran and Rowe, Washington,

DC, Frank T. Vecchione, Law Office of Frank T. Vecchione, Michael L. Lipman, Coughlan Semmer and Lipman, San Diego, CA, Bernstein, Martina, Morgan Lewis, Counselors at Law, S. Thomas Pollack, Irell and Manella, Los Angeles, CA, for Defendants.

### ORDER RE RECOVERY OF XÉLAN FOUNDATION'S ATTORNEYS' FEES AND DEFENSE COSTS

[Dkt No. 128]

BURNS, District Judge.

This matter is before the Court on the motion of defendant xélan Foundation, Inc. ("Foundation") under the Equal Access To Justice Act ("EAJA"), 28 U.S.C. 2412 or, alternatively, under analogous provisions of the Internal Revenue Code, 26 U.S.C. § 7430 ("Section 7430") for recovery of its attorneys' fees and costs incurred to defend this injunctive relief action ("Motion"). The Foundation seeks recovery of its actual litigation expenses from the government in the amount of $232,176.30, with waiver of the statutory maximum hourly rate for attorneys' fees compensation or, alternatively, in the amount of $101,008.05 at the statutory rate. Plaintiff the United States filed an Opposition, and the Foundation filed a Reply. For the reasons discussed below, the Motion is ***CONDITIONALLY GRANTED.***

## I. DISCUSSION

### A. *Background*

The United States brought this action for injunctive relief against several entities in the xélan family of companies and six individuals associated with the management of one or more of the entities, alleging they engaged in schemes to defraud the United States of tax revenues involving many millions of dollars. The Complaint was based on 18 U.S.C. § 1345 (a fraud injunction statute) and 26 U.S.C. § 7402(a) (a tax injunction statute). Concurrently with its sealed Complaint, filed October 29, 2004, the United States filed an unnoticed *ex parte* application for a broad Temporary Restraining Order ("TRO") and for the appointment of a temporary receiver with powers to engage accountants and attorneys. On November 3, 2004, District Judge Thomas J. Whelan granted the government's requested TRO in its entirety and immediately appointed William A. Leonard, Jr. as Temporary Receiver without bond. Judge Whelan set the OSC hearing for November 18, 2004 to decide whether a preliminary injunction should issue, whether a Receiver should be appointed, and to address issues regarding the repatriation of foreign assets, among other things. Dkt No. 6. Judge Whelan ordered the Complaint unsealed on November 3, 2004, to coordinate this action with the government's planned execution of search warrants in a related criminal investigation of xélan. The United States had represented the circumstances would create a substantial likelihood that defendants would dissipate assets if they received prior notice of the TRO application. Owing to Judge Whelan's absence from the district, this case was reassigned to the undersigned District Judge on November 3, 2004.

This Court granted the Temporary Receiver's *ex parte* applications to appoint particular counsel and accountants to assist in his work for the duration of the receivership, and continued the preliminary injunction hearing to December 3, 2004 at the parties' request. After a lengthy hearing, this Court dissolved the TRO, denied the entry of any preliminary injunction, terminated the Temporary Receiver's appointment, and ordered the return of all assets frozen and property seized pursuant to the TRO. Dkt Nos. 110, 116. The Order Denying Preliminary Injunction recited the government failed to establish a likelihood of success on the

merits of its tax evasion suspicions. Among the evidentiary shortcomings this Court identified were: the IRS had not ruled any particular xélan program actually violates any particular statute or regulation; no other agency or court had made such a finding; an absence of evidence of actual dissipation of defendants' assets or to support the claim that assets seized under the TRO were traceable to criminal activity; no evidentiary basis to substantiate suspicions that xélan doctors underpaid taxes through purportedly impermissible tax avoidance schemes; a showing by defendants that refuted the government's assertion the xélan entities lacked adequate funds or reserves to cover their outstanding obligations, as reflected in the Temporary Receiver's own Initial Preliminary Report; the entities' financial condition discredited the government's "Ponzi scheme" allegations; the freezing of all the Foundation's assets, including approximately $42 million administered in pursuit of legitimate charitable work nationally and internationally, far exceeded the fraction of its programs targeted by the IRS; and even if the government ultimately prevailed on the merits, the scope of the TRO it requested was overly broad and disproportionate to the tax liability exposure. Dkt No. 116, pp. 10–11.

On December 17, 2004, the government dismissed the case in its entirety. Dkt No. 119. The Foundation now moves under the EAJA for an award of its attorneys' fees and costs incurred in connection with its defense of the government's unsuccessful suit for injunctive relief. Alternatively, the Foundation moves for that relief under Section 7430. The Foundation does not seek damages arising from the problems it encountered as a result of the TRO.[1] Rather, it confines its request to reimbursements of actual costs to defend the government's lawsuit. It seeks an upward adjustment to the statutory cap on hourly rates paid its attorneys so that it can recover all of its litigation expenses.

The government responds its decision to seek a Receiver was justified, and "the IRS had a reasonable basis in law for attempting to temporarily shut down the Foundation's activities" to preserve the *status quo*, precluding the Foundation's request for defense fees and costs. Opp. pp. 13–14. The government also contends the Motion is procedurally defective, alleging: (1) the Foundation's fee request does not include the information required by statute (*i.e.*, itemized statements from attorneys); and (2) the recovery amounts sought are unreasonable ("nearly a quarter million dollars in costs and fees for a month's worth of work for one of many defendants in this case" exceeds "by 1/3 the professional fees that the Temporary Receiver seeks to recover for the same time period, for administering the assets and records of all of the defendants")(Opp. pp. 19–20). The government urges the Motion be rejected as "not complying with the procedural and substantive require-

---

1. The Foundation contends for more than 30 days it "was unable to make distributions, had checks bounced, had its mail diverted, and ceased all normal operations," and "is still trying to recover and is struggling to conduct its affairs" and undo the damage, and "its original documents have not been returned." Reply p. 2 fn. 2. The Foundation is particularly disturbed that the government focused the Temporary Receiver "on preserving evidence needed for a criminal prosecution when, in fact there was no criminal investigation at the time involving the Foundation and no criminal prosecution or criminal investigation has ensued" (Reply 2:19–22), while asserting "that the Temporary Receiver, acting with the express purpose of benefiting a prosecutor in a hypothetical criminal case *against* the Foundation, was somehow benefiting the Foundation" (Reply 2:17–19).

ments of the fee-shifting statutes." Opp. 21:14–17.

### B. *Legal Standards*

■■■ A preliminary injunction is a "device for preserving the status quo and preventing the irreparable loss of rights before judgment" and is intended to "last until a final judgment is reached." *Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1422 (9th Cir.1984); *see Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.,* 16 F.3d 1032, 1036 (9th Cir. 1994). A TRO issues to preserve the status quo before a preliminary injunction hearing may be had, and remains in effect only until the preliminary injunction hearing is held. *Qualcomm, Inc. v. Motorola, Inc.,* 185 F.R.D. 285, 287 (S.D.Cal.1999). "Wrongful enjoinment" is determined "when a party enjoined had the right *all along* to do what it was enjoined from doing," and "correlates with the concept that a preliminary injunction is intended to protect 'loss of rights *before judgment*' and to last until a final judgment is reached." *Id.* at 287–88, *citing Nintendo,* 16 F.3d at 1036; *Sierra On–Line,* 739 F.2d at 1422. A TRO restraint may be found wrongful when a preliminary injunction is denied because the court finds failure to establish likelihood of success on the merits. *Qualcomm,* 185 F.R.D. at 287–88.

The EAJA provides:

Except as otherwise specifically provided by statute, a court **shall award to a prevailing party** other than the United States **fees and other expenses,** in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, **unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.**

28 U.S.C. § 2412(d)(1)(A) (emphasis added).

■■■ Applying that standard, attorneys' fees and costs are awarded if: (1) the applicant is a "party" eligible to seek relief under the EAJA; (2) the moving party is the "prevailing party" in the underlying action; and (3) the government's position in the underlying action was not "substantially justified." A "party" eligible to seek attorneys fees and costs is defined in terms of maximum net worth standards, "except that an organization [exempted from taxes under 26 U.S.C. § 501(c)(3) as a charitable organization] ... may be a party regardless of the net worth of such organization...." 28 U.S.C. § 2412(d)(2)(B). A "prevailing party" is "one who has been awarded some relief by the court." *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 603, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *Farrar v. Hobby,* 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (a party "prevails" in an action when the relief granted represents a "material alteration of the legal relationship between the parties"). The burden is on the government to avoid an EAJA award of attorneys' fees and costs to a prevailing party by showing its position was "substantially justified." *See Scarborough v. Principi,* 541 U.S. 401, 414, 124 S.Ct. 1856, 158 L.Ed.2d 674 (2004); *see Gilbert v. Shalala,* 45 F.3d 1391, 1394 (10th Cir.1995).

■■■ The government argues Section 7430 is the only fee-shifting statute applicable in this case, as the EAJA provides at 28 U.S.C. § 2412(e) that the EAJA "shall not apply to any costs, fees, and other expenses in connection with any proceeding to which section 7430 of the Internal Revenue Code of 1986 applies...." Sec-

tion 7430 provides for limited fee shifting in any "court proceeding which is brought by or against the United States in connection with the determination, collection or refund of any tax, interest or penalty under this title" and contains provisions analogous to the EAJA with respect to a prevailing party's request for attorneys' fees and costs. *See Huffman v. C.I.R.*, 978 F.2d 1139 (9th Cir.1992). "Prevailing party" under Section 7430 requires the requesting party "meet[ ] the requirements of the first sentence of [the EAJA definition at 28 U.S.C.] section 2412(d)(1)(B)...."[2] 26 U.S.C. § 7430(c)(4)(A)(ii). However, the burden is on the taxpayer to show the government's position was not substantially justified under the Internal Revenue Code fee-shifting statute. *Sliwa v. C.I.R.*, 839 F.2d 602, 608–09 (9th Cir.1996) (the burden of proof is on the party seeking an award of litigation costs under a provision of the tax code: to be awarded reasonable litigation costs under Section 7430, a party must have substantially prevailed with respect to the most significant issue or set of issues presented and must establish the position of the United States was not substantially justified under all the facts and circumstances surrounding the proceeding, whether or not the government loses the case); *Norgaard v. C.I.R.*, 939 F.2d 874, 881 (9th Cir.1991); *see also Kenagy v. U.S.*, 942 F.2d 459 (8th Cir.1991). "The requirement that the taxpayer bears the burden of proof under § 7430 is in contrast to cases under the [EAJA], 28 U.S.C. § 2412, where the burden of proof is upon the government to prove that its position was substantially justified." *United States*

*v. Hodgekins*, 832 F.Supp. 1255, 1260 (N.D.Ind.1993). The burden shifts to the government to show a reasonable basis in law and fact for its position once the taxpayer has made the requisite Section 7430 showing. To avoid the award, the government must establish its "position in the proceeding was substantially justified." 26 U.S.C. § 7430(c)(4)(B).

In addition to the EAJA requirements, Section 7430 imposes three other requirements for fees and costs recovery: (1) the underlying administrative or court action must be one by or against the United States "in connection with the determination, collection, or refund of any tax, interest, or penalty" under the Internal Revenue Code; (2) the party must have "exhausted the administrative remedies available to such party within the Internal Revenue Service; and (3) the prevailing party must not have protracted the proceedings." 26 U.S.C. §§ 7430(b)(1), (3). The analogous requirements generally have been interpreted as having the same meaning for purposes of Section 7430 as under the EAJA when they are consistent. *See Huffman*, 978 F.2d at 1142 (the reasoning employed by the courts under the attorney's fees provision of the Equal Access to Justice Act applies equally to review under Section 7430); *see Kenagy*, 942 F.2d at 464.

The Ninth Circuit has broadly interpreted Section 7430. *See, e.g., Smith v. Brady*, 972 F.2d 1095 (9th Cir.1992) (holding that a suit filed by taxpayers seeking to expunge a letter from their tax files was governed exclusively by Section 7430). The government characterizes its action

---

2. "A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which *shows that the party is a prevailing party and is eligible to receive an award under this subsection,* and the amount sought, including an *itemized statement* from any attorney or expert witness representing or appearing in behalf of the party stating the *actual time* expended and *the rate* at which fees and other expenses were computed...." 28 U.S.C. § 2412(d)(1)(B) (emphasis added).

here as one "to freeze the defendants' assets and appoint a receiver, so that *the IRS could conclude its investigation* of xélan, while preserving the defendants' assets so that they would be *available to pay tax liabilities that might be assessed in the future.* In that respect, the action did involve the 'determination' and 'collection' of taxes under the Internal Revenue Code." Opp. 12:3–7 (emphasis added). The Court finds the Motion is governed by Section 7430 standards as an action by the United States in connection with the determination or collection of tax, interest, or penalty under the Internal Revenue Code. With respect to the exhaustion of administrative remedies element, this action does not involve any agency determination presented for review by the courts. *See Hodgekins,* 832 F.Supp. 1255 (*before a taxpayer files suit,* he or she must exhaust administrative remedies within the agency). The government, not the taxpayer, initiated this judicial proceeding action for injunctive relief. The government identifies no administrative proceeding it contends the Foundation should have preliminarily exhausted before bringing this Motion. The Court finds this claim does not involve a reviewable agency action, so no exhaustion requirement applies.[3] Finally, no issue is presented with respect to the Section 7430 requirement that the prevailing party not have unreasonably protracted the proceedings. This litigation proceeded on an expedited basis. The Defendants received notice of the TRO on

November 3, 2004. The preliminary injunction hearing occurred December 3, 2004.

The dispositive issue is whether the government's position was substantially justified. The government correctly states that Section 7430 is not a "strict liability" statute compelling it to pay costs whenever it loses underlying litigation. Opp. p. 12. Even if the court finds the government was not substantially justified, Section 7430 "authorizes, rather than commands, the court to award reasonable litigation costs," in its discretion. *Zinniel v. Commissioner,* 883 F.2d 1350, 1355 (7th Cir. 1989).

### C. *The Merits*

#### 1. *The Foundation Is An Eligible Prevailing Party*

■ The Court finds the Foundation is a "party" eligible for a fees and costs award.[4] Mot. P & A 3:3–10 (the Foundation represents it is "a charitable foundation qualified under section 501(c)(3) of the Internal Revenue Code and exempt from taxation under section 501(a) of such Code," qualifying it as a "party" eligible to seek attorneys' fees and costs without application of the net worth standards defined in 28 U.S.C. § 2412(d)(2)(B)). The government concedes "that because this Court denied the motion for preliminary injunction and dissolved the temporary receivership, the Foundation prevailed with

---

3. This interpretation is supported by the application and procedure and limitations period associated with an application "to the IRS" for a costs award to the prevailing party "for administrative costs" (26 U.S.C. § 7430(b)(4)), as distinguished from "reasonable litigation costs incurred in connection with" any "court proceeding ... in connection with the determination, collection, or refund of any tax, interest or penalty...." 26 U.S.C. §§ 7430(a)(2), (a). The statutory provisions related to costs recovery are articulat-

ed throughout Section 7430 in the disjunctive, including with respect to the definitions of "reasonable litigation costs" and "reasonable administrative costs." 26 U.S.C. §§ 7430(c)(1), (c)(2).

4. "At the time it sought the injunction, the IRS had not yet decided whether to revoke the tax-exempt status of any donor-directed foundation established by the defendants." Opp. 14 n. 29.

respect to the most significant issue presented," and is a "prevailing party" within the meaning of the fee shifting statute. Opp. 12:12–17. None of the TRO relief survived the preliminary injunction hearing, and the Court finds the Foundation is the prevailing party in the government's lawsuit. *See Buckhannon,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *Farrar,* 506 U.S. at 111, 113 S.Ct. 566.

### 2. *The Government Lacked Substantial Justification*

■ The government argues its position was "substantially justified," precluding the Foundation's requested award. *Id.* 12:19–22. Substantial justification for seeking injunctive relief requires the action have a reasonable basis in both fact and law. 28 U.S.C. § 2412(d)(1)(B); *see Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (holding that "substantially" does not mean in this context "justified to a high degree," but rather "justified in substance or in the main," *i.e.,* "justified to a degree that could satisfy a reasonable person"); *Scarborough,* 541 U.S. at 414, 124 S.Ct. 1856; *Gilbert,* 45 F.3d at 1394.

■ The government relies on *United States v. Estate Preservation Services ("EPS"),* 202 F.3d 1093 (9th Cir.2000) for the proposition that entry of a preliminary injunction is proper to enjoin defendants from marketing "abusive tax shelters" and contends its actions in this case were substantially justified, precluding the Foundation's recovery of prevailing party fees and costs. In *EPS,* the court of appeals upheld the propriety of a preliminary injunction issued to enjoin, under 26 U.S.C. § 7408,[5] one entity and two individual promoters of certain tax shelters from rendering abusive tax shelter advice under 26 U.S.C. § 6700 (prohibition against promoting abusive tax shelters with codified penalties).[6] However, among the distinguishing facts, the preliminary injunction in that case was confined to specific prohibited representations the defendants were enjoined from making. That court found: "The preliminary injunction in this case does not exceed the scope of what is necessary to forestall Appellants from further misrepresentations. Appellants may continue to publish legitimate tax planning advice, even regarding trusts. They are simply prohibited from advocating shelters that provide no legitimate shelter from lawful taxation." *EPS,* 202 F.3d at 1106.

In contrast, the government here failed to convince this Court the requested preliminary injunctive relief targeted only suspect Foundation programs and only to

---

5. Section 7408 authorizes the government to initiate a civil action "to enjoin any person from *further engaging* in conduct subject to penalty under section 6700 (relating to penalty for promoting abusive tax shelters, etc.) or section 6701 (relating to penalties for aiding and abetting understatement of tax liability)...." 26 U.S.C. § 7408 (emphasis added).

6. "Congress added the statutory provisions that apply to this litigation, I.R.C. Sections 6700 and 7408, as part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248, 96 Stat. 324. The government must prove five elements to obtain an injunction under these statutes: (1) the defendants organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement; (2) they made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement; (3) they knew or had reason to know that the statements were false or fraudulent; (4) the false or fraudulent statements pertained to a material matter; and (5) an injunction is necessary to prevent recurrence of this conduct. I.R.C. §§ 6700(a), 7408(b). The government bears the burden of proving each element by a preponderance of the evidence.... The traditional requirements for equitable relief need not be satisfied since Section 7408 expressly authorizes the issuance of an injunction." *EPS,* 202 F.3d at 1098 (citations omitted).

a degree necessary to ensure coverage of a potential tax liability from that entity's activities. The Foundation had to defend against the continuation of massive restraints and external control imposed on all its activities, assets, and premises, effectively shutting down its operations, an objective this Court found not substantially justified on the evidence presented. Ironically, the government also purported to protect the doctor-participants while seeking to substantiate they cooperated in allegedly abusive schemes.

As characterized by the government: "The purpose of the lawsuit was to freeze hundreds of millions of dollars in assets held for the benefit of others, and appoint a receiver to take charge of those assets, preserving the status quo while the Internal Revenue Service and the United States Postal Service investigated alleged criminal and fraudulent activities." Opp. 4:7–13. However, as discussed in this Court's Order denying preliminary injunction relief, the total asset freeze and seizure, as it applied to the Foundation, far exceeded in scope any specific arrangements potentially involving a suspected illegal tax dodge. The government's own summary of the factual basis for its suit against the Foundation reveals the disproportionate breadth and depth of the TRO or substantial justification for continued massive interference through a preliminary injunction:

> In short, the undisputed evidence available to the United States before it filed suit, and the evidence presented to the Court at the December 3, 2004 hearing, showed clearly that the xélan Foundation was developed, marketed, and operated *more like* a tax avoidance scheme than a legitimate charity, and that by November 4, 2004, *the management of the xélan Foundation had deteriorated* to such a point that it required independent management.

Opp. 10:16–20 (emphasis added); Opp. 13:16–14:2 ("the United States filed this suit to maintain the status quo of an alleged charitable foundation that, in the IRS's view, was *likely being used* to help doctors avoid paying *their* legitimate share of taxes") (emphasis added).

The United States maintains it "filed this action to freeze the defendants' [*i.e.,* all xélan entities and certain individuals'] assets and appoint a receiver, so that the IRS could conclude its investigation of xélan while preserving defendants' assets so that they would be available to pay tax liabilities *that might be assessed in the future.*" Opp. 12:3–6 (emphasis added). The speculative nature of the government's claims relied on no particular tax code violation to underpin a likelihood of success on the merits and maintained an ambiguity about *whose* eventual potential liability for future taxes or penalties it sought to secure with Foundation funds. That the Foundation may have "required independent management" did not warrant government seizure of indefinite control, particularly as the Temporary Receiver determined in any event the financial condition of the Foundation was not precarious. Moreover, the "particular" areas of IRS concern related to "the Foundation's student loan program," a program that had been discontinued before the initiation of this litigation (so that no prospective relief was needed to curtail the conduct) and that involved a small fraction of Foundation assets, and "its *pro bono* reimbursement program" suspected of constituting illegal or abusive tax avoidance schemes. Opp. 13:19–14:2.

The Foundation characterizes the government's suggestion that the defendants in this case were helped with their accounting as a result of this lawsuit, and that the Temporary Receiver actually conferred a benefit on the entity defendants, as adding "insult to injury." Reply 1:3–11.

The government "obtained extraordinary relief that was out of all proportion to any alleged injury the Government suffered." *Id.* at 1:20–21. According to the Foundation, the government achieved that result when it "improperly told Judge Whelan that it had 'evidence' (as opposed to the 'sworn uncertainty' it turned out to be when defendants had an opportunity to respond) that all of the defendants 'control and are dissipating millions of dollars that were fraudulently obtained from members of the public through what is, in part, a Ponzi scheme," and that there was " 'imminent danger of the property being lost, concealed, injured, diminished in value or squandered.' " Reply 1:22–2:3, quoting *Ex Parte* App. For TRO at 22:11–13, 26:1–2. The Foundation contends the government was wrong in all its assertions, and has not met its burden to show that it acted with substantial justification "in any respect." Reply 3:3–4. The government's own expert witness could not state the Foundation violated any law or regulation. The money purportedly being dissipated was accounted for. No Ponzi scheme emerged. "Simply put, the Government overreached without justification." Reply 2:4–5.

The Court finds the Foundation carried its burden to establish the government's legal and factual position on the scope and basis of the pre-trial injunctive relief it temporarily obtained was not substantially justified. The government did not demonstrate reasonableness "in substance or in the main" to justify the extent of its civil intrusion, in consideration of the circumstances surrounding the TRO and preliminary injunction proceedings as the government devised and pursued them. *Pierce,* 487 U.S. at 565, 108 S.Ct. 2541. As the Foundation notes, "the Government did far more than just seek a receiver." Reply 6:17–18. The Foundation criticizes the government's conduct in: providing no notice so defendants could respond to the *ex parte* TRO that unjustifiably asserted "de-fendants control $500 million in assets derived from a fraudulent scheme, all of which is in danger of dissipation" (Reply 6:19–21, quoting *Ex Parte* App. For TRO at 4:24–25); alleging a "Ponzi scheme" without factual basis; seeking "the issuance of an unnoticed TRO on a declaration by an IRS expert that was 'unable to say definitively ... that there is any violation of the internal revenue regulations by any of these so-called tax exempt products or any of the other activities that are at issue in this case' " (Reply 6:23–26); seeking the appointment of a Temporary Receiver "to effectively shut down the Foundation" (Reply 6:27–28); requesting "a continuation of the TRO and Temporary Receiver even after it learned that all of the Foundation's assets were accounted for" (Reply 7:1–2); and requesting "that a freeze on Foundation distributions remain in place for an indefinite period of time while it sorted things out," with serious consequences to the Foundation's charitable work and annuity distributions (Reply 7:3–8).

In consideration of the Court's prior findings associated with the dissolution of the TRO and denial of preliminary injunctive relief, and as discussed in this Order, the Court finds the Foundation is a prevailing party in this litigation, the government's conduct and its effects overreached the bounds which circumscribe appropriate TRO and preliminary injunctive relief, and the government was not "substantially justified" in its legal and factual positions and representations with respect to the necessity for the extraordinary action against the Foundation. The Court further finds the Foundation is entitled to recover its reasonable attorneys' fees and costs associated with the litigation proceedings.

### 3. Calculation Of Award

There appears to be no challenge to the $5,443.05 costs component of the award the Foundation claims. With respect to the attorneys' fees component, the Foundation

requests leave to exceed the statutory hourly rate cap to recover "the actual rates of the attorneys who produced a thorough work product in a very short amount of time" and asks the Court to consider "the unusual and highly complex nature of the proceedings spawned by the Government's actions." Mot. P & A 10:10–14. The total amount of actual fees and litigation costs the Foundation requests is $232,176.30. Dkt No.128 13:8–9. If the Court awards attorneys fees without waiving the $150.00 per hour statutory limit, the total request would be $101,008.05.[7] Dkt No. 128, p. 13, n. 4. The statutory caps may be waived if "the court determines that a special factor, such as the limited availability of qualified attorneys for such proceeding, the difficulty of the issues presented in the case, or the local availability of tax expertise, justifies a higher rate." 26 U.S.C. § 7430(c)(1)(B)(iii).

▇▇▇ A litigant seeking to recover attorneys' fees under either the EAJA or Section 7430 must establish, among other things, that the costs and fees sought are reasonable in consideration of the prevailing market rates for the kind and quality of services provided. 26 U.S.C. § 7430(c)(1). The Foundation argues it needed to engage counsel experienced in a range of specialties who had to produce a thorough work product in a very short amount of time, involving unusual and complex circumstances. Mot. P & A 10:10–14. Counsel "had to have experience in: civil litigation, asset freezes, tax, and in criminal procedure, given the ongoing criminal investigation and concurrent

search warrant served on the Foundation." *Id.* at 11:5–8. The Foundation needed expertise "tailored to the specific matters being litigated," beyond merely tax expertise or the services of high quality counsel. *Id.* at 10:23–24. The TRO effectively shut down the entity, "rendered the books and records of the Foundation inaccessible and froze all assets," forcing counsel "to respond under emergency circumstances, by assembling a [competent] litigation team." *Id.* at 11:1–5.

The Foundation provides the qualifications and contributions of the members of its legal team charged with marshaling "massive amounts of exhibits and factual information" and extensive legal briefing associated with a project of "extreme urgency," causing "more resources to be devoted than would be the case in a normal response to a standard complaint or motion" and the need to utilize experienced counsel. Mot. P & A pp. 11–12; Declarations of Henry G. Will, Esq. of Conner & Winters, LLP, Nicole M. Chicoine, Esq. of Chicoine & Hallett, P.S., Pamela Naughton, Esq. of Sheppard Mullin Richter & Hampton, LLP, and Frank J. Johnson, Esq. of the Law Offices of Frank J. Johnson. Billing rates and time allocations are provided to support the costs summaries for all but the Sheppard Mullin charges:

> Connors & Winters, LLP (the Foundation's ongoing tax counsel): $32,402.50 in attorneys' fees for 115.70 hours of work [8] and $1,426.82 in litigation costs incurred. Chicoine & Hallett, P.S. (local litigation counsel): $29,128.75 in attorneys' fees for 102.5 hours of work.[9]

7. The statutory cap on the hourly rate payable for legal services under the EAJA is $150.00 and under Section 7430(c)(1)(B)(iii) is $125.00, with cost-of-living adjustments for calendar years after 1996.

8. Hourly rates for three participating attorneys from the firm ranged from $230.00 per hour to $300.00 per hour. Mot. Ex. A, Will Decl. ¶ 2.

9. Hourly rates for three participating attorneys from the firm ranged from $300.00 per hour to $350.00 per hour, with two other individuals listed at billing rates of $95.00 and $75.00 per hour respectively. Mot. Ex. B, Chicoine Decl. ¶ 4.

Sheppard Mullin Richter & Hampton, LLP (defense counsel): $98,273.00 in attorneys' fees for 225.0 hours of work [10] and $1,167.79 in litigation costs.

Law Offices of Frank Johnson (expert counsel in asset freezes, receiverships, and criminal procedure): $66,929.00 in attorneys' fees for 193.90 hours of work [11] and $2,848.44 in litigation costs. Mot. P & A pp. 11–13.

The government challenges the technical adequacy of the Foundation's supporting documentation. A prevailing party seeking a fees and costs award must comply with the provision of 28 U.S.C. § 2412(d)(1)(B) (EAJA), which provides:

A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party *stating the actual time expended and the rate at which fees and other expenses were computed.*

*See* 26 U.S.C. § 7430(c)(4)(A)(ii) (emphasis added).

The government cites no Ninth Circuit authority for its proposition that to meet the "itemized statement" requirement, the requesting party must provide "contemporaneous time records" with "a detailed description of the subject matter of the work with supporting documents, if any...." Opp. 18:14–19, *citing In re Donovan,* 877 F.2d 982, 994 (D.C.Cir.1989). The government represents "the Supreme Court criticized summaries of the kind submitted here, observing that, 'contemporaneously recorded time sheets are the *preferred practice,*'" citing *Webb v. Board of Education,* 471 U.S. 234, 238 n. 6, 105 S.Ct. 1923, 85 L.Ed.2d 233 (1985) (emphasis added) (addressing the recovery of attorneys' fees in a 42 U.S.C. § 1988 civil rights action with reconstructed summaries of counsel's time and tasks).

The government also contends the amount of the recovery sought is "wholly unreasonable": "The Foundation seeks to recover nearly a quarter million dollars in costs and fees for a month's worth of work for one of many defendants in this case." Opp. p. 19. The Foundation persuasively argues it was confronted with an emergency: "it had in excess of $42 million frozen, it believed—as did the Temporary Receiver—that it was the subject of a criminal investigation, and it was a defendant in a civil suit." Reply 9:1–3. As the target of an all-inclusive and unnoticed TRO with imminent necessity to defend against a preliminary injunction, it required the mobilization of experienced counsel with various expertise in a short period of time, while access to its own records was restricted.

The Court finds there is no requirement that actual time sheets must be provided before an award of fees is

---

10. Hourly rates and allocation of hours breakdowns are not provided for the several participating attorneys from the Sheppard Mullin firm. The Naughton Declaration in support of the Motion merely recites: "According to industry-wide surveys of comparably-sized law firms, our law firms' rates are 13%—23% below market." Mot. Ex. C, Naughton Decl. ¶ 7.

11. Hourly rates for three participating attorneys from the firm ranged from $225.00 to $370.00 per hour. Mot. Ex. D, Johnson Decl. ¶ 4. The Johnson firm's billings apparently include time spent representing the Foundation "in its dealings with the Receiver and Receiver's legal counsel following the Court's grant of the TRO in order to enable the Foundation to recover its records and resume its business." Mot. P & A 11:21–24.

proper. However, the Court also finds additional substantiation of specific tasks and allocated attorney time, among other things, must be provided before a reasonable fee award can be determined. For example, the Shepard Mullin component of the Foundation's claim lacks billing rates, tasks, and time breakdowns. The scope of all the compensable work must be restricted to services performed for the Foundation (as opposed to other of the multiple xélan-affiliated defendants whom the service providers may also have assisted in these proceedings). In addition, the Court solicits additional briefing regarding the application of the fee cap waiver and application of lodestar criteria to the calculation of the attorneys' fees component of the award.[12]

■ The Court finds the Foundation can meet its expenses substantiation obligation either by providing actual timesheets, redacted where necessary to protect attorney-client privileges, or by providing the declarations of the individuals who performed the tasks sought to be reimbursed, attesting under oath to the time spent in specified categories of activity on the Foundation's defense in this case, with enough detail to enable the Court to evaluate the reasonableness of the award sought. *See Dennis v. Chang*, 611 F.2d 1302, 1308 (9th Cir. 1980) (affidavits from counsel were ade-

quate evidence to permit the calculation of a proper fee award even though more detailed time sheets were available).

## II. CONCLUSION AND ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED**:

1. The Foundation's Motion is *CONDITIONALLY GRANTED* to the extent the Court will award the Foundation's undisputed claimed costs and its reasonable attorneys' fees.

2. On or before *July 22, 2005*, the Foundation shall serve and file supporting documentation consistent with this Order to substantiate in greater detail the attorney tasks, time, and billing rates applied in defense of the Foundation in this action. In addition, points and authorities shall be provided to assist the Court in its determination to what extent deviation from the statutory hourly rate cap is warranted in these circumstances.

3. On or before *August 15, 2005*, the government may serve and file responsive briefing solely on the issue of reasonableness of the claimed defense time and tasks expenses. In addition, points and authorities may be provided to assist the Court in its determination to whether deviation from the statutory hourly rate cap is warranted in these circumstances.

---

12. The accepted "lodestar" method for calculating reasonable attorneys' fees multiplies the hours a professional spent on a case by the reasonable hourly compensation rate. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986); *Jordan v. Multnomah County*, 815 F.2d 1258 (9th Cir.1987); *D'Emanuele v. Montgomery Ward & Co., Inc.*, 904 F.2d 1379 (9th Cir.1990), *overruled on other grounds by Burlington v. Dague*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (there is a strong presumption that a lodestar figure computed by the lodestar/multiplier method of awarding attorneys' fees

represents reasonable attorneys' fees). Adjustments to a lodestar or touchstone figure may then be made in consideration of such factors as: time and labor required; novelty and difficulty of the questions; skill requisite to perform the service properly; preclusion of other employment due to acceptance of case; customary fee; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; and experience and ability of the attorneys/professionals. *See Quesada v. Thomason*, 850 F.2d 537, 539 n. 1 (9th Cir.1988), *citing Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir.1975).

4. Unless the Court finds the supplemental filings raise issues warranting oral argument, the amount of the Foundation's fees and costs award will be taken under submission to be decided on the papers.

**IT IS SO ORDERED.**