In re Gary E. KRAUSE, Debtor.

United State of America, Plaintiff,

and

Linda S. Parks, Trustee, Intervenor,

v.

Gary Krause and Richard Krause, Defendants.

Bankruptcy No. 05–17429.
Adversary No. 05–5775.

United States Bankruptcy Court,
D. Kansas.

Aug. 8, 2006.

See also 349 B.R. 255, 2006 WL 2411360.

Mark D. Kiefer, Law Offices of Brian G. Grace, Wichita, KS, Emily B. Metzger, Edward J. Nazar, Linda S. Parks, Wichita, KS, for Debtor.

Janene Marasciullo, US Department of Justice, Washington, DC, for Plaintiff.

***ORDER ON (1) ADEQUACY OF DEFENDANTS' ASSET DISCLOSURES (Dkt. 98, 100 and 108); (2) DEFENDANT RICHARD KRAUSE'S APPLICATION TO EMPLOY LAW OFFICES OF BRIAN G. GRACE (Dkt. 102) AND APPLICATION FOR COMPENSATION FOR ATTORNEY FEES AND EXPENSES (Dkt. 103 and 104); (3) DEFENDANT GARY KRAUSE'S APPLICATION FOR ENGAGEMENT OF REDMOND & NAZAR, L.L.P. AS SPECIAL COUNSEL TO THE TRUSTEE (Dkt. 28); (4) DEFENDANT GARY KRAUSE'S APPLICATION FOR INTERIM FEES AND EXPENSES (Dkt. 26 and 29); and (5) DEFENDANT GARY KRAUSE'S MOTION FOR APPROVAL OF BUDGET FOR ATTORNEY FEES (Dkt. 27)***

ROBERT E. NUGENT, Chief Judge.

The Court conducted an evidentiary hearing on the above matters on June 15, 2006, after receiving the United States of America's ("Government") comment on the court-ordered asset disclosures provided by defendants and the Government's and chapter 7 trustee's objections to the other motions. The Court has previously ruled on the defendants' motions for continuation of monthly living expenses that were heard the same date.[1] The Government appeared by Janene M. Marasciullo of the U.S. Department of Justice, Washington, D.C. Debtor Gary Krause appeared by Edward J. Nazar. Mr. Nazar also appeared for his firm, Redmond & Nazar, L.L.P., Wichita, Kansas ("Nazar Firm"). Defendant Richard Krause appeared by Mark D. Kieffer of Law Offices of Brian Grace, Wichita, Kansas ("Grace Firm"). Mr. Kieffer also appeared in support of his firm's application decided here today. The trustee, Linda S. Parks appeared by her counsel, Scott Hill of Hite, Fanning & Honeyman, Wichita, Kansas. The Court is now prepared to rule on the remaining motions heard on June 15, 2006.

*Background*

For the sake of brevity, the Court will refrain from an extended recitation of the procedural history and factual background of this adversary proceeding. For a thorough recitation of those matters, the Court directs readers to its April 14, 2006 Memorandum Opinion [2] ("April Opinion") and its July 21, 2006 Order on Defendants' Motions for Continuation of Monthly Living Expenses [3] ("July Order") where the procedure and facts are set forth with considerably more particularity.

For purposes of this Order, the Court notes that the remaining matters are presently before the Court pursuant to its directives and orders contained in the April Opinion which modified in part the preliminary injunction entered in this case in December 2005 enjoining the transfer or use of cash, property, assets, or bank accounts of the following trusts and entities: Krause Children Trust (KCT) Nos. I, II, III, IV, V; the Gary Krause Trust (GKT); PHR, LLC (PHR); Drake Enterprises, Inc. (DEI); Financial Investment Management Corporation (FIMCO); and Federal

---

1. Dkt. 123.

2. Dkt. 80.

3. Dkt. 123.

Gasohol Corporation (FGC).[4] Because the Court only preliminarily determined that the assets held by the above trusts and entities were held as nominees of debtor Gary Krause, the Court modified the preliminary injunction to permit defendants to make application to the Court for payment of their attorney fees with frozen funds pending a dispositive finding concerning the nature and ownership of the assets held by the trusts and entities. Due largely to the Court's belief that debtor's ability to defend the claims of the Government would be severely hampered without compensated counsel and that the bankruptcy process would likely suffer as well, the Court agreed to entertain motions for payment of attorney fees utilizing the frozen funds during the pendency of the adversary proceeding, under the following conditions: (1) Defendants would make complete, sworn disclosures of all assets owned or controlled by the named trusts and entities, *including any other entities with which Gary had a connection of any kind* ("Asset Disclosures"); (2) Defendants' counsel would submit proposed budgets for fees and expenses earned to date and anticipated through trial ("Fee Budget"); (3) Defendants' counsel would make interim applications for attorney fees and expenses ("Fee Applications"); and (4) Gary's counsel would make application to be employed as special counsel to the trustee ("Employment").[5]

In its April Opinion, the Court stressed that defendants' full compliance with these conditions was imperative:

Gary Krause's ability to retain and pay Mr. Nazar (or any other lawyer) from the GKT trust assets is strictly condi-tioned upon his faultless compliance with the conditions enumerated above.[6]

The Court also clearly expressed its intent to preserve and protect the estate and the Government's position in this case pending a final determination of the claims and issues:

If, at the conclusion of this adversary proceeding, the Court determines that the property of the GKT, the KCTs or the Krause Family Trust is in fact Gary's property and is legally encumbered by the Government's tax liens, Richard and Gary will be required to repay any and all withdrawals authorized under this Order to the Government or the estate, as their interests shall appear, as a condition to Gary receiving a discharge in this case.[7]

Having refreshed its recollection of the terms of the April Opinion and having independently reviewed the defendants' submissions, the Court now addresses defendants' compliance with each of the conditions and rules on the various applications.

*Discussion*

Because the use of frozen funds to pay attorney fees was conditioned upon the defendants' Asset Disclosures, the Court will first address their sufficiency. Only Gary and Revenue Agent Marsha Waterbury testified at the June 15, 2006 hearing. The Court received into evidence Government's Exhibits 2, 4, 5, 6, 18, 19, 20, 21, 22 and 23; Debtor's Exhibits A and B; and Richard Krause's Exhibits A–E.

1. ***Debtor's Court–Ordered Asset Disclosures***

Because Richard's disclosures are identical to the disclosures filed by Gary on May

---

**4.** Dkt. 12.

**5.** *See* Dkt. 80, April Opinion, pp. 25–29.

**6.** *Id.* at 26.

**7.** *Id.* at 29.

11, 2006 regarding the trusts and entities, the court will focus its attention on Gary's disclosures.[8] Gary declared that the following entities own or control the following assets:

| Entity | Asset |
|---|---|
| 1. FIMCO (FIMCO is wholly owned by KFIT) | a. Bank account (1) at Commerce Bank<br>b. 43% membership interest in Live Wire Media Partners, LLC<br>c. 43% membership interest in K Mountain LLC |
| 2. Polo Executive Rentals | a. checking account at Farmers Bank and Trust (in name only, account owned by KCT I). |
| 3. PHR | a. 7711 Oneida Court property |
| 4. DEI | No assets. |
| 5. FGC (FGC is wholly owned by GKT) | a. bank account (1) at Commerce Bank<br>b. bank account (1) at Southwest National Bank<br>c. account (1) at Merrill Lynch<br>d. account (1) at UBS Paine Weber<br>e. 500 shares of Lifeline Therapeutics<br>f. account (1) at Charles Schwab<br>g. account (1) at Smith Barney<br>h. 83 shares of Ramp Corp.<br>i. account (1) at Vanguard<br>j. account at Terra Nova Trading<br>k. 1000 shares of Facekey Corp.<br>l. 1000 shares of LJ International<br>m. 1000 shares of Northern Orion Res. |
| 6. Development Associates Inc. (Development Associates Inc. is wholly owned by GKT) | a. 15+ acres in Reno County |
| 7. GKT | a. bank account (1) at Southwest National Bank<br>b. money market account at Farmers Bank and Trust<br>c. CD at Farmers Bank and Trust<br>d. account with Jordan Index Fund<br>e. 90,000 shares (100%) of FGC<br>f. 1100 shares (100%) of Development Associates Inc. |
| 8. Krause Family Irrevocable Trust | a. 5000 shares (100%) of FIMCO<br>b. bank account at Commerce Bank<br>c. 43% interest in LiveWire Media Partners LLC<br>d. 43% interest in K Mountain LLC |
| 9. KCT I | a. bank account at Southwest National Bank<br>b. checking account at Bank of America<br>c. CD at Bank of America |

**8.** *See* Dkt. 98 and 100. Richard filed disclosures of his personal assets and interests on May 24, 2006. *See* Dkt. 108.

|  |  |
|---|---|
|  | d.  account at Farmers Bank and Trust (in name of Polo Executive Rentals)<br>e.  account at Merrill Lynch<br>f.  7 life insurance policies on Gary, Drake, and Richard L.<br>g.  gold coins<br>h.  100 shares (100%) of Barton Oil Corporation<br>i.  15.2% ownership of PHR (7711 Oneida)<br>j.  2000 Ford Explorer<br>k.  1999 Dodge Durango |
| 10.  KCT II | a.  bank account at SW National Bank<br>b.  CD at Farmers Bank and Trust<br>c.  CD at First Kansas Bank<br>d.  2 life insurance policies on Richard L<br>e.  gold coins<br>f.  7.6% ownership in PHR (7711 Oneida Court) |
| 11.  KCT III | a.  bank account at SW National Bank<br>b.  CD at UMB National Bank of America<br>c.  CD at Farmers Bank and Trust<br>d.  a life insurance policy on Gary and one on Drake |
| 12.  KCT IV | a.  7 life insurance polices on Gary |
| 13.  KCT V | a.  77.2% ownership in PHR (7711 Oneida Court)<br>b.  Mortgage on 7711 Oneida<br>c.  2 life insurance policies on Teresa Briggs |

The Government contends that Gary has omitted assets that he or one of the entities he has a connection with owns or controls: (1) a hunting lodge in Reno County; (2) a safe deposit box in the name of DEI; (3) several storage units at Security Self Storage; (4) a receivable of FGC generated by a mortgage on an oil tanker; and (5) rental income generated from 15 acres of land owned by Development Associates. The Government also suggested that Gary has failed to disclose information regarding several off-shore bank accounts.

### a.  Hunting Lodge

The hunting lodge is described as "house at 160 acres NW 1/4 sec 31, town 2, Stafford Township, KS."[9] It is owned by Quivera Associates, Inc. ("Quivera").

Gary testified that neither he, the GKT, nor the KCTs own any part of Quivera. He explained that Quivera was formed in 1986 or 1987. It was initially owned by Kansel Corporation (owned by Gary), Richard Krause and Southwest Property Inc. (owned by one Kent Walmer). Each owned a one-third interest in Quivera. In 1988 or 1989, Walmer no longer wanted his interest in the hunting lodge so Quivera bought Southwest Property Inc.'s shares, leaving 8000 shares outstanding between Richard and Gary (Kansel). Sometime thereafter, Gary gave his shares to his wife, Teresa Briggs, who then gave the stock to their sons, Drake and Rick.[10]

9.  Gov't Ex. 20.

10.  No monetary consideration was given for Gary's 50% interest in Quivera in either trans-

fer. Gary claims he has the stock certificates for the boys. These transfers took place while Gary's Tax Court case was in controversy.

Quivera's 2002 tax return, however, lists Richard D. Krause and the GKT as equal owners of Quivera.[11]

Notwithstanding the question of Quivera's ownership, the hunting lodge should have been listed in Gary's disclosures in some fashion as Gary had some kind of connection with Quivera. At one point, he admittedly had an ownership interest in Quivera. Moreover, he maintained the property insurance on the hunting lodge and is currently the named insured for the hunting lodge.[12]

Ultimately, the hunting lodge was not listed among the assets owned or controlled by the GKT. Indeed, it was not listed at all. Gary failed to make any disclosures relating to Quivera or the hunting lodge.

### b. *Drake Enterprise, Inc.'s (DEI) Safe Deposit Box*

Gary declared that DEI had no assets.[13] DEI, however, has a safe deposit box and it was not listed as an asset of DEI. Gary admits he failed to do so. He argues, however, the safe deposit box is not an asset, but a liability since it is an expense. He explains he simply forgot to list the safe deposit box because it only comes to his attention once a year when *he* receives an invoice for the annual rent. Its contents are unknown. Although Gary has paid the rent for the safe deposit box, he claims he has not opened it for years. The

existence of the safe deposit box and its contents should nonetheless have been disclosed.

### c. *Storage Units*

Gary currently leases and controls 2 storage units. Gary testified he leased these storage units in May 2005 in order to get the Oneida property, where he currently resides, presentable for sale. His real estate agent advised him to clear out the "junk" in the house. According to Gary, the storage units contain yard tools and equipment, exercise equipment, holiday decorations, boxes of clothes, boxes of books, and one filing cabinet of old business records unrelated to the Government's document requests. While he concedes the storage units were not disclosed, he freely offered at trial to make their contents available to the Government.

Revenue Agent Waterbury testified that the Government has been unable to gain access to the storage units to determine their contents. During her review of various bank records obtained by the Government, however, she noted that FIMCO and FGC had paid for storage units since 1999 or 2000. It is not apparent from the record whether these are the same storage units.

While Gary testified that he provided a copy of the storage unit lease agreement to the Government in response to a docu-

---

11. See Gov't Ex. 21. Quivera's tax return was prepared by FIMCO. Gary claims the tax return is incorrect in stating that the GKT is a 50% owner of Quivera. Richard Krause disclosed his 50% interest in Quivira. *See* Dkt. 108, Ex. A.

12. The hunting lodge is insured through Madrigal & Associates, Inc., the same company Gary uses to insure all his other properties. Gary, however, insists that Quivera paid the property insurance and taxes for the hunting lodge. He acknowledges he received the bills

for the property and paid it, but claims he was subsequently reimbursed by Quivera. He claims he only obtained property insurance for the property because his brother was unable to and his sons owned 50% of it. *See* Gov't Ex. 20.

13. DEI is an S corporation. Drake is the sole owner. Teresa Briggs was the founder, president and 100% shareholder from its inception until 1998 when she turned over the stock to Drake. Gary became president of DEI in 1998.

ment request, neither lease documents nor lease payment records were offered at the hearing. Whatever the value, if any, the contents may have, the storage units do contain assets and property that purportedly belong to Gary and the units are controlled by Gary. Certainly the existence of the storage units and a description of their contents should have been disclosed.

### d. Tanker Mortgage

FGC owns or held a mortgage on an oil tanker called the MV Sillery (the Sillery).[14] In 1995, FGC made a substantial loan in the amount of $320,000 on the Sillery. The tanker was owned by Trafalgar Marine, but was operated and managed by Carribean Atlantic Petroleum Company ("CAPCo"). FGC acted as a passive mortgage lien holder, earning a substantial interest rate and some profit sharing (2 cents a gallon for every gallon that went through the tanker).

In 1997, Gary was contacted by the head of CAPCo. He was advised that CAPCo could not make its mortgage payment and to "come get your collateral." Gary went to St. Thomas and met with CAPCo representatives. He investigated why CAPCo could not make the mortgage payments and concluded that with a little tighter management, the tanker could be profitable. FGC negotiated to provide additional working capital in exchange for some managerial control.[15]

In 2000, FGC began ridding itself of management intensive investments in con-templation of the retirement of Norris Taylor, president and co-owner of FIMCO, and disposed of its operating interest in the Sillery. FGC turned over control of the ship and released the mortgage. The obligor on the mortgage was Overseas Trust Company and the loan was guaranteed by Carribean Bunkers. The carry-back note was for $400,000 or $500,000. It included management fees that FGC earned, accrued, and declared as income. Since 2000, FGC has been receiving annual payments contracted in the mortgage. FGC received a payment last year. When pressed about the nondisclosure of this receivable, Gary indicated that the mortgage is "pretty close to being paid" although he could not give a dollar amount of the balance. Gary explained the lack of reference to the Sillery mortgage leads him to believe that the mortgage has been paid in full.

He further claims the mortgage was disclosed as an asset on FGC's balance sheet and on its tax returns as notes receivable, both of which he contends have previously been provided to the Government. Even if true, this did not excuse Gary's nondisclosure of the tanker mortgage note on the one-page disclosure for FGC.

### e. Tenant Farmer on Development Associates' 15 Acres

Gary disclosed that Development Associates[16] owns approximately 15 acres in Reno County and has no other assets.

---

14. FGC is wholly owned by the GKT. See Dkt. 98. In his Statement of Financial Affairs, Gary described FGC's nature of business as "management." FGC has been in existence since 1980.

15. According to Gary's previous testimony at the preliminary injunction hearing, FGC subcontracted management of the tanker to FIMCO. FIMCO earned management fees from FGC which it was still receiving periodically.

See April Opinion, n. 22. No mention of these management fees was made in Gary's disclosures.

16. Development Associates is wholly owned by the GKT. See Dkt. 98. It is a Subchapter S or C corporation. It is not in good standing and according to Gary, it has substantial liabilities.

There, however, appears to be rental income from a tenant farmer on the 15 acres. Gary testified that a "guy" rents the property every other year. This rent was not disclosed. Gary testified that he did not think to disclose it because the rent is so de minimus. No evidence was presented, however, regarding the identity of the tenant, the amount of the rent and to whom it is actually paid. The Court's April Opinion did not contain a threshold amount of materiality for disclosure; the rental income generated from the tenant should have been disclosed.

The Government presented evidence suggesting that this property possibly generated income through participation in farm subsidy programs from the United States Department of Agriculture.[17] Gary testified that Development Associates has not entered into an agreement with the Farm Service Agency (FSA). No documentary evidence was presented of a signed agreement between Development Associates and the FSA to indicate this acreage was enrolled in a farm program. The Court finds there is insufficient information to conclude Development Associates owns or controls a government program subsidy and that Gary has failed to disclose it as an asset of Development Associates.

### f. Off–Shore Bank Accounts

Agent Waterbury testified that when she reviewed FGC's bank records, she noted several wire transfers which she was unable to trace. She volunteered her suspicion that these wire transfers occurred to or from off-shore accounts. Agent Waterbury was not examined further regarding her suspicions, the wire transfers, or the suggested off-shore accounts. And the Government did not question Gary concerning the existence of any off-shore accounts under his control or other entities' control. No evidence was presented regarding these suspicioned off-shore accounts. The Court finds there is insufficient evidence to conclude that Gary or any of his entities own or control any off-shore accounts that were omitted from his Asset Disclosures.

### g. General Comment Concerning the Record

The Court is compelled to comment on the state of the evidentiary record and ongoing disputes between the Government and Gary concerning document production. For Gary's part, he claims to have previously produced documents containing information that was omitted from his Asset Disclosures. In the Court's view this is irrelevant. The April Opinion made no provision for excluding disclosures if the information was previously provided to the Government or shown on documents produced or previous filings. Nor does it matter whether the Government has previously requested the information or documents.[18]

---

**17.** *See* Govt. Ex. 2. This document purports to be notification to the producer, Developers [sic] Associates, that the crop base acreage must be reduced under then existing regulations to participate in a farm program. It sets forth the producer's rights to appeal the county committee's determination. No evidence was presented that Development Associates took any action with respect to the notice.

**18.** The Court's directive to make full disclosure of assets is not tied in any manner to requests for production of documents that may have been served by the Government on Gary. The Court has not seen the Government's document requests. Indeed, the scope of the Government's requests may differ from the scope of the Court's April Opinion. The Court's April Opinion is focused on the assets *currently* held by Gary or the trusts or entities with which he has a connection. For in-

For the Government's part, it alludes to Gary's noncompliance with requests for production of documents.[19] But the Court has never been provided with the document requests the Government has served upon Gary nor provided with a log of the documents it has in its possession. It is also apparent from Agent Waterbury's testimony that the Government has not retained a copy of all documents made available by Gary, exercising its judgment as to what documents are relevant to the issues at hand. The Court senses that the Government has introduced into evidence very little of its arsenal of documents it has obtained in this proceeding. If there are compliance issues or other discovery disputes, the Court would expect the Government to bring those to the Court's attention as provided by the rules if they cannot first be resolved among the parties.[20] In the absence of a motion to compel, the Court has no way of knowing whether the information or document was in fact requested by the Government and whether Gary complied with the request, particularly when neither party presents the document at hearing. In the future, the Court suggests that if there are outstanding discovery issues, the parties bring them to the Court's attention in a timely fashion or run the risk that their discovery complaints have be waived.[21]

### Conclusion as to Asset Disclosures

■ Despite Gary's repeated statements of his intent to comply with discovery and provide full disclosures, the Court is not convinced he has done so. Gary's

Asset Disclosures omit: (1) his connection to the hunting lodge, (2) DEI's safe deposit box, (3) storage units and contents, (4) FGC's tanker mortgage, and (5) Development Associates' rental income. His proffered excuses, inadvertence and the alleged de minimus nature of the omitted assets, are untenable in light of the Court's admonition to Gary that his ability to use the frozen assets to pay his bankruptcy counsel would be conditioned on his faultless compliance with the April Opinion. This has not occurred.

2. *Employment of Redmond & Nazar, L.L.P. as Special Counsel to the Trustee and the Nazar Firm's Application for Interim Compensation from Frozen Assets*

As invited by the Court's April Opinion, the Nazar Firm filed its application to be engaged as special counsel to the trustee pursuant to 11 U.S.C. § 327(e).[22] The Nazar Firm states that it will

"assist the Trustee in the administration of the estate, [ ] represent the interest of the Debtor in pending adversary actions, and [ ] identify and determine assets of the bankruptcy estate under 11 U.S.C. § 541. The representation of the Debtor should also include any defense necessary under an action brought under 11 U.S.C. § 523, as well as any defenses under 11 U.S.C. § 548."[23]

The Nazar Firm alleges that it does not represent any creditors of the debtor or hold any interest adverse to the debtor.

---

stance, the Court is not interested in a bank account that was closed 15 years ago and would not expect Gary to disclose all assets *ever* held at any time.

19. The Court reminds Gary of his continuing duty to supplement incomplete or incorrect discovery responses under Fed. R. Bankr.P. 7026 and Fed.R.Civ.P. 26(e).

20. *See* Fed. R. Bankr.P. 7037; Fed.R.Civ.P. 37; D. Kan. LBR 7026.1.

21. *See* D. Kan. Rule 37.1(b).

22. Dkt. 28, Case No. 05–17429.

23. *Id.,* p. 2.

As this Court noted in the April Opinion, Gary's expressed need to utilize some of the frozen assets for his attorneys fees in this adversary proceeding is troubling. The request implicates alternative bodies of the law. Determining the applicable law depends upon what this, or some other court, ultimately determines the true nature of the frozen assets to be. The frozen assets are either actually Gary's or they are, for the most part, assets owned in some manner by spendthrift trusts. To the extent they are Gary's assets and he owned them pre-petition, the frozen assets are assets of the bankruptcy estate. Their use is subject to the provisions of the Bankruptcy Code as it has been interpreted by the United States Supreme Court in *Lamie v. United States Trustee.*[24] However, if the frozen assets are the property of these trusts and other entities, and if the trusts and entities are otherwise legitimate, the assets are excluded from the property of the estate under § 541(c)(2) and their use is not subject to the Code. But even if that is the case, the assets likely remain subject to the Government's tax liens (at least as to the GKT of which Gary is a beneficiary) whether or not they make up the corpus of valid spendthrift trusts.[25] Assuming this Court even has jurisdiction to allow their use for any purpose, any such use could only be predicated on some form of protection being offered the Government as lienholder. The forms of protection could be many: security interests in other property, collateral pledges by third parties, or bonds are but three of the options available to Gary here.

This Court has some reservations about denuding Mr. Krause of the ability to defend himself in this adversary when this Court has yet to make a dispositive determination of the true ownership nature of the frozen assets. While neither party has provided any citation to a case in which a bankruptcy judge has grappled with the use of similar funds in a preliminary injunction context, the Court's research uncovered a number of non-bankruptcy cases in which judges considered the use of frozen assets for attorneys fees. Cases allowing such use are few and far-between[26] while those denying use are legion. The leading case is *Commodity Futures Trading Com'n v. Noble Metals, Inc.*[27] In *Noble Metals,* the Court of Appeals for the Ninth Circuit held that a district judge has discretion to limit or forbid attorneys fees payments in asset freeze situations.[28] This is particularly so where, as in the present circumstances, the frozen assets will not be sufficient to compensate the defendant's victims or customers for their alleged loss.[29] The Ninth Circuit added that the discretion accorded the district judge must be exercised in light of the fact that the alleged wrongdoing has yet to be proven.[30] The *Noble Metals* court placed the burden

**24.** 540 U.S. 526, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)

**25.** *See United States v. Craft,* 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002); *Drye v. United States,* 528 U.S. 49, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999); *In re Orr,* 180 F.3d 656 (5th Cir.1999); *Bank One Ohio Trust Co. v. United States,* 80 F.3d 173 (6th Cir.1996); *Leuschner v. First Western Bank & Trust Co.,* 261 F.2d 705 (9th Cir.1958).

**26.** *See S.E.C. v. Dowdell,* 175 F.Supp.2d 850 (W.D.Va.2001).

**27.** 67 F.3d 766 (9th Cir.1995).

**28.** *Id.* at 775.

**29.** *Id., citing Federal Trade Com'n v. World Wide Factors, Ltd.,* 882 F.2d 344, 347 (9th Cir.1989).

**30.** *FSLIC v. Dixon,* 835 F.2d 554, 565 (5th Cir.1987) (Adversary system threatened when one party gains control of the other party's means of defense).

on the defendant to show that he can only secure counsel if use of the frozen assets is permitted.

A number of district judges have grappled with this problem, particularly in securities cases, with varying outcomes. In *S.E.C. v. Duclaud Gonzalez de Castilla,* the court denied use of the frozen funds for living expenses, but permitted them to be used for attorneys fees on a limited basis because no clear showing of wrongdoing had been necessary to sustain the preliminary injunction and asset freeze for violating the securities laws.[31] Another district judge held that a modification of the preliminary injunction to allow frozen assets to be used for fees must be in the interest of defrauded investors and pointed out that civil defendants have no right to use the funds of others to defray legal expenses.[32] In the tax collection context, the Seventh Circuit has allowed the release of frozen funds for criminal defense fees, but not for defense of a civil forfeiture action.[33] Finally, the Court notes that the Internal Revenue Code provides for fee-shifting in the event a taxpayer prevails in a tax collection controversy with the IRS and then demonstrates the absence of a substantial basis for the Government's claim.[34]

■ The "rules" with respect to non-bankruptcy cases seem to be that courts have discretion to allow the use of frozen funds and that discretion must be exercised in light of the fact that the freeze is often a provisional remedy. At the same time, where there is insufficient property to compensate one's victims or repay one's creditors, courts are entirely justified in exercising their discretion to deny use of frozen funds for attorney's fees. Moreover, allowing the usage for fees must be in the interest of those investors or creditors for whose benefit the fees were frozen in the first instance.

■ Here, the Court takes to heart the admonition that its discretion must be carefully exercised because the freeze is, at this point, a provisional remedy. The Court must also consider the fact that the frozen assets are worth far less than the Government's claims. As noted in the Appendix, the total liquid assets of the trusts and entities is approximately $767,000. The Government's filed claims seek in excess of $3 million. While there is no doubt that the involvement of competent counsel on all sides will advance the search for the truth in this case, or at least facilitate it, the contemplated arrangement will not benefit the creditors if what little they can hope to recover will be entirely dissipated in defending Gary's position. Thus, even if none of these assets turns out to be property of his estate, the Court considers it well within the bounds of permissible choice to deny Gary the use of these funds for this purpose at this time.

■ If the frozen assets are indeed Gary's property, and hence property of the estate, § 327 applies to determine whether the Nazar Firm may act as special counsel to the trustee in these circumstances. Section 327(e) provides in part:

> The trustee, with the court's approval, may employ, for a *specified special purpose, other than to represent the trustee in conducting the case,* an attorney that has represented the debtor, *if in the best interest of the estate, and if such attor-*

**31.** 170 F.Supp.2d 427, 430 (S.D.N.Y.2001).

**32.** *S.E.C. v. Grossman,* 887 F.Supp. 649, 661 (S.D.N.Y.1995).

**33.** *United States v. Michelle's Lounge,* 126 F.3d 1006, 1009–1010, (7th Cir.1997).

**34.** 26 U.S.C. § 7430. *See United States v. Guess,* 390 F.Supp.2d 979 (S.D.Cal.2005).

ney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

The Court concludes that as to this adversary proceeding, the Nazar Firm's representation of the debtor is in direct conflict with and adverse to the estate. Debtor's defense of this adversary, and indeed the defenses likely to be asserted against the Government's § 523 and § 548 claims, do not benefit the estate in any fashion.[35] Similarly, in defending against the Government's declaratory count and nominee theory, the Nazar Firm's representation and services will benefit the debtor, not the estate.[36] Simply put, debtor's interest in this adversary is not aligned with the chapter 7 trustee or the estate, and is in fact, in direct conflict with the trustee's and estate's interest in collecting and distributing property of the estate to debtor's creditors. In a case where the debtor's principal creditor is the plaintiff, the debtor is the defendant, and the parties are fighting over what property is in the estate, debtor's counsel is in the position of representing an interest adverse to the estate with respect to the matter for which he

seeks to be employed. And where the trustee has aligned herself with the plaintiff on the issue, one cannot fathom a more adversarial relationship.

■ The United States Supreme Court succinctly explained the purpose of obtaining approval for employment under § 327 in *Lamie v. United States Trustee*:

Section 327's limitation on debtors' incurring debts for professional services without the Chapter 7 trustee's approval is not absurd. In the context of a Chapter 7 liquidation it advances the trustee's responsibility for preserving the estate.[37]

If anything, Gary's vigorous defense of the Government's claims is likely to deplete the estate and delay its administration. Section 330's requirement that the attorney's services must benefit the estate exists to prevent the unfairness of allowing the debtor to deplete the estate by pursuing his interests to the detriment of his creditors.[38] Here, if Gary prevails on his contention that the trusts in question are spendthrift trusts and not property of the estate under § 541(c)(2), he will confer no benefit on the estate; rather, he will personally benefit, much like a debtor whose

**35.** *See* Section V.D.3., Professional Fee and Expense Guidelines in Bankruptcy Cases Pending Before the Honorable Robert E. Nugent, effective January 31, 2002. *See also In re Kingsbury*, 146 B.R. 581 (Bankr.D.Me. 1992) (Attorney fees incurred by chapter 7 debtors in defending two § 523 dischargeability complaints were not recoverable as administrative expense where debtors benefitted from their attorney's services.).

**36.** *See In re Ewing*, 167 B.R. 233 (Bankr. D.N.M.1994) (Attorney's services that benefit the estate and are compensable are those that protect or increase available assets or decrease debtor's indebtedness.); *In re Hanson*, 172 B.R. 67 (9th Cir. BAP 1994) (denying debtor's counsel application for compensation where services rendered were in direct oppo-

sition to the actions of the trustee in pursuing his § 704 duties; debtor's counsel opposed trustee's motion to sell debtor's residence to protect debtor's homestead exemption.); *In re Estes*, 152 B.R. 32, 34 (Bankr.W.D.N.Y.1993) (reaffirmation of debt does not benefit the estate if creditor is unlikely to share in the distribution.); *In re Kohl*, 95 F.3d 713 (8th Cir.1996) (Attorney's services rendered in prior chapter 7 and conversion to chapter 11 were not beneficial to estate where attorney should have known that reorganization was not feasible.).

**37.** 540 U.S. 526, 537, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).

**38.** *See Hanson*, 172 B.R. at 74.

attorney's services protect an exemption.[39]

Additionally troubling is the fact that Gary has made no offer or proposal to secure the repayment of estate funds should the Government ultimately prevail on its claims. Because he has wholly failed to offer any material assurance of repayment, the contemplated expenditures will not benefit the estate; they will deplete it. Moreover, Gary is himself a lawyer and has the ability, if not the will, to assist the trustee in identifying assets of the estate. Indeed, that is one of his duties as a chapter 7 debtor under § 521.

The Court recognizes the value to the process of having Gary expertly represented. Nevertheless, having concluded that the Nazar Firms's representation of debtor in this adversary proceeding does not benefit the estate and is in fact adverse to the estate's interests, the Court cannot approve the Nazar Firm's employment as special counsel to the trustee. Albeit with no small regret, the Nazar Firm's employment application (Dkt. 28) must be DENIED.

■ With equal regret, the Court must also deny the Nazar Firm's requested compensation earned to date in this difficult case. The denial of the firm's engagement as special counsel pursuant to § 327(e) implicates *Lamie*, where the Supreme Court held that:

§ 330(a)(1) does not authorize compensation awards to debtors' attorneys *from estate funds*, unless they are employed as authorized by § 327. If the attorney is to be paid from estate funds under § 330(a)(1) in a Chapter 7 case, *he must be employed by the trustee and approved by the court.*[40]

The Court notes that like the debtor's attorney in *Lamie*, the Nazar Firm could have ensured it would be compensated before filing Gary's chapter 7 bankruptcy.[41] For whatever reason, the firm failed to do so. But the mandate of *Lamie* is crystal clear: absent approval of Nazar's employment pursuant to § 327, he cannot be compensated from estate funds.[42] This determination obviously does not preclude debtor from paying his attorney with post-petition earnings, as many of this Court's chapter 7 debtors do who find themselves the subject of an adversary proceeding, or with other sources. The Court notes that during the pendency of these very proceedings, Gary has found the means to retain a criminal lawyer to represent him in his ongoing tax controversy with the Government.[43] If Gary wishes to mount a vigorous defense to the current proceedings, he clearly has other options that will not be at the expense of the estate or his creditors.

---

**39.** *See In re Hanson, supra.*

**40.** 540 U.S. 526, 538–39, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (Emphasis added).

**41.** The Supreme Court recognized the practice, not prohibited by § 330(a)(1), of a debtor retaining counsel and paying reasonable compensation in advance of filing for bankruptcy. *Id.* at 537–38, 124 S.Ct. 1023.

**42.** *See In re Weinschneider,* 395 F.3d 401 (7th Cir.2005) (attorney's claim for fees incurred in successfully resisting trustee's turnover motion as an administrative expense was denied; if an attorney is to be paid from estate funds

under § 330(a)(1) in a chapter 7 case, the attorney must be employed by the trustee and approved by the court).

**43.** *See In re Engel,* 124 F.3d 567 (3rd Cir. 1997) (Attorney employed by chapter 11 debtor in possession as special criminal counsel under § 327(e) was not entitled to be paid attorney fees from estate; even if attorney's retention as special counsel is approved by the bankruptcy court, attorney must still show that his services were necessary and benefitted the estate under § 330.).

Given this Court's conclusion that Gary's Asset Disclosures were deficient and that *Lamie* prohibits the payment of debtor's attorney fees from assets of the bankruptcy estate, the Court finds it unnecessary to address in detail Gary's proposed Fee Budget (Dkt. 27) or Nazar's interim Fee Application (Dkt. 29). Both are summarily DENIED.

### 3. Defendant Richard Krause's Application to Employ Law Offices of Brian G. Grace and Grace's Application for Compensation *from Frozen Assets*

■ Defendant Richard Krause ("Richard") has also filed an application to employ the Grace Firm to represent him in his capacity as the trustee of the KCT I–V and the GKT (Dkt.102) and to compensate Grace with the frozen assets of the KCT I–V. Richard does not indicate that his application is based on § 327(a) or (e).[44] Indeed, Richard has identified no provision of the Bankruptcy Code under which he proceeds.[45] The Court construes his application as seeking to pay his attorneys with potential estate assets under § 330(a)(1). Section 330(a)(1) requires an attorney to be employed pursuant to § 327 in order to be compensated from the estate. Section 330 also restricts compensation to services that benefit the estate. Section 330(a)(4)(A) provides:

Except as provided in subparagraph (B) [not applicable here], the court shall not allow compensation for—...

(ii) services that were not–

(I) reasonably likely to benefit the debtor's estate; or

(II) necessary to the administration of the case.

A Grace Firm application for an administrative expense under § 503(b)(2) would be similarly flawed.[46] That section makes compensation awarded under § 330(a) an administrative expense, but as noted previously, § 330(a) requires the attorney or professional person to be employed under § 327. In short, there is no authority under the Bankruptcy Code to compensate the Grace Firm for attorney services rendered on behalf of Richard under the circumstances here where Richard is neither the debtor, the case trustee, or a creditor[47] and the Grace Firm has not been, nor could it be, employed under § 327.

The Grace Firm's proposed legal representation of Richard, both in responding to the initial IRS summons served on him and in defending this adversary proceeding, will not benefit the estate. Richard admits that the Grace Firm's representation of him is in his capacity as trustee of the various trusts and his application specifically acknowledges that Grace's representation "is necessary to represent the interests and honor the fiduciary duties of [Richard] to defend the Trusts from the claims made [by the Government and the estate] in this adversary action."[48] In short, the Grace Firm does not even purport to represent the estate. Rather than benefit the estate, Richard's position in this adversary is to oppose its claims, asserting that the trust assets are not prop-

---

44. Section 327 contemplates that the trustee may employ an attorney for the estate. Here, however, the trustee objects to Grace's employment. Dkt. 111.

45. Since Richard is not the debtor in this chapter 7 case, and is a party defendant only in this adversary proceeding, § 329 does not apply.

46. Section 507(a)(1) permits the estate to pay priority administrative expenses that are allowed under § 503(b).

47. *See* § 503(b)(4).

48. Dkt. 102, ¶ 3.

erty of the estate and that the trusts are not Gary's nominees as the Government and the trustee contend. In other words, the Grace Firm's representation of Richard in this proceeding is to defeat the Government's and the trustee's claim that the trust assets are property of the estate. Accordingly, it falls prey to the same conflict issues noted in the Court's discussion of the Nazar Firms application.

In addition, the Grace Firm's representation is not necessary to administer the case. As evidenced by Richard's testimony at the preliminary injunction hearing, Richard has at best a sketchy understanding of the trusts' origination, their funding, their current holdings, and their administration. His actions have largely been driven by Gary. The Grace Firm's instructions appear to have come primarily from Gary, not Richard. In these circumstances, the Court cannot approve Richard's application to employ the Grace Firm and to pay its attorney fees and expenses with the frozen trust assets—potential estate property.[49]

Richard is in the same position as any other unwilling participant in litigation and is responsible for attorney fees he incurs, even where those fees and expenses are incurred in his capacity as trustee of the KCT I–V and the GKT. And as the Government points out, Richard's personal asset disclosures demonstrate an ability to pay his own fees in connection with this litigation. Moreover, the Court sees little need for much additional involvement or participation on the part of Richard in these proceedings. Richard is closely aligned with Gary and most likely will ride his coattails. If Richard does not want to be saddled with the attorney fees and expenses of this litigation, he can end his financial exposure by resigning as trustee of the various trusts.

Richard's application to employ the Grace Firm (Dkt.102) and to pay the Grace Firm's attorney fees and expenses from frozen assets of the KCT I–V (Dkt. 103) are DENIED. In light of these determinations, the Court need not reach the merits either of the Grace Firm's fee application (Dkt. 103 and 104) or its fee budget going forward (Dkt. 103).

### Conclusion

The Court finds that Gary's court-ordered asset disclosures are deficient in material respects. Complete disclosure was a preliminary condition to use of the funds and assets frozen by this Court's preliminary injunction. Gary's application to employ the Nazar Firm as special counsel to the trustee is DENIED. The Nazar Firm's application for interim compensation for attorney fees and expenses from frozen assets is DENIED. The Nazar Firm may request argument on its pending motion to withdraw as Gary's counsel. Gary's proposed fee budget is DENIED AS MOOT. Richard's application to employ the Grace Firm and to compensate the Grace Firm from frozen assets is DENIED. Grace's interim fee application and proposed fee budget are DENIED AS MOOT.

---

**49.** Should Gary and Richard prevail in this adversary proceeding and the Court ultimately rule in their favor that the trust property is not property of the bankruptcy estate, Richard and Gary may seek reimbursement of fees and expenses from the trust funds. That, however, is not a matter for this Court. If the trust funds are not property of Gary's bankruptcy estate, this Court has no power with respect to the trusts. *See* 28 U.S.C. § 1334(e).

## APPENDIX
### Asset Disclosures Analysis

All of the values or amounts shown for the assets listed were derived from Richard's and Gary's Asset Disclosures (Dkt. 98 and 100), with the exception of the value of the Oneida property. The value of the Oneida property is the 2005 appraised value as determined by the Sedgwick County Appraiser's office (Dkt. 22, Ex. A). The Court has not attempted to place a value on various ownership interests or units in LLCs or other entities held by the trusts or entities listed. Nor has the Court valued the approximate 15 acres of undeveloped land held by Development Associates, Inc.

| DESCRIPTION | ACCOUNT NO. | AMOUNT | TOTALS |
|---|---|---|---|
| **LIQUID ASSETS:** | | | |
| FIMCO: Commerce Bank | 670040113 | 5,808.34 | |
| **FIMCO subtotal** | | | $ 5,808.34 |
| FGC: Commerce Bank | 670040071 | 8,879.50 | |
| FGC: SW National Bank | 2619695 | 1,498.31 | |
| FGC: Merrill Lynch | | 24,499.03 | |
| FGC: UBS Paine Weber | WT1829140 | 8,566.19 | |
| FGC: Lifeline Therapeutics | 500 shares | 1,125.00 | |
| FGC: Charles Schwab | 3226–1961 | 1,629.50 | |
| FGC: Smith Barney | 185–15399–14117 | 3,963.66 | |
| FGC: Vanguard | 0050/09877867914 | 14,073.62 | |
| FGC: Terra Nova Trading | 32012928 | 413.40 | |
| FGC: TNT..Facekey Corp | 1000 shares | 52.00 | |
| FGC: TNT..LJ International | 1000 shares | 3,690.00 | |
| FGC: TNT..Northern Orion Res | 1000 shares | 4,520.00 | |
| **FGC subtotal** | | | $ 72,910.21 |
| GKT: SW National Bank | 2634619 | 72.81 | |
| GKT: Farmers Bank & Trust (money market account) | 370429 | 16,403.08 | |
| GKT: Farmers Bank & Trust (CD) | 1012123 | 42,195.56 | |
| GKT: Jordan Index Fund | | 34,577.87 | |
| **GKT subtotal** | | | $ 93,249.32 |
| KCT I: SW National Bank | 2634511 | 18,799.24 | |
| KCT I: Bank of America (checking) | 2860792763 | 13,342.37 | |
| KCT I: Bank of America (CD) | 91000014240247 | 67,918.00 | |
| KCT I: Farmers Bank & Trust (aka Polo Executive Rentals) | 8135292 | 1,410.33 | |
| KCT I: Merrill Lynch | 278–5011438–6 | 8,163.61 | |
| KCT I: Gold coins | | 70,106.20 | |
| **KCT I subtotal** | | | $ 179,739.75 |
| KCT II: Sw National Bank | 2634538 | 2,210.15 | |
| KCT II: Farmers Bank & Trust (CD) | 000 101 0658 | 104,167.00 | |
| KCT II: First Kansas Bank (CD) | 12721 | 89,299.23 | |
| KCT II: Gold coins | | 19,317.00 | |
| **KCT II subtotal** | | | $ 214,993.38 |

| DESCRIPTION | ACCOUNT NO. | AMOUNT | TOTALS |
|---|---|---|---|
| KCT III:  SW National Bank | 2634546 | 17,676.45 | |
| KCT III:  UMB National Bank of America (CD) | 369242430 | 102,675.00 | |
| KCT III:  Farmers Bank & Trust (CD) | 000 101 0110 | 79,934.15 | |
| **KCT III subtotal** | | | $  200,285.60 |
| No bank accounts for KCT IV or V | | | |
| **TOTAL LIQUID ASSETS** | | | $  766,986.60 |
| **NON–LIQUID ASSETS:** | | | |
| **Cash Value of Life Ins. Policies** | | | |
| Met Life | 2526725 | 8,492.23 | |
| Met Life | 6070162 | 4,208.36 | |
| Met Life | 6688112 | 2,016.04 | |
| Met Life | 6162499 | 3,526.11 | |
| Met Life | 6615461 | 3,538.54 | |
| Met Life | 8392342 | 3,296.08 | |
| Aurora | C11555384L | 15,026.70 | |
| Aurora | C11324399L | 96,391.39 | |
| Pacific Life | 047137500M | 13,539.75 | |
| Pacific Life | 047626700M | 4,521.42 | |
| Reassure | N7001592 | 35,201.00 | |
| Reassure | 4110925 | 4,597.36 | |
| Reassure | N7001622 | 33,981.83 | |
| Reassure | 4108193 | 36,048.00 | |
| Prudential | 31889322 | 4,387.59 | |
| Lincoln Benefit Life | F0090505 | 3425.16 | |
| Lincoln Benefit Life | F0090504 | 3425.16 | |
| **Life Ins. Cash Value Subtotal** | | | $  275,622.72 |
| **Real Property:** [1] | | | |
| .7711 Oneida Court residence [2] | | $392,000.00 | |
| **Real Property Subtotal** | | | $  392,000.00 |
| **Personal Property:** | | | |
| 2000 Ford Explorer (KCT I) | | $5,500.00 | |
| 1999 Dodge Durango (KCT I) | | $5,000.00 | |
| **Personal Property Subtotal** | | | $   10,500.00 |

1.  The GKT, through Development Associates, Inc., owns 15+ acres in Reno County.  Because there is no evidence on the value of this property, the Court has not included it in its analysis.

2.  This property is owned by PHR, LLC. KCT I, II and V share ownership interest in PHR. KCT V has an alleged $305,000 mortgage on this property.

| DESCRIPTION | ACCOUNT NO. | AMOUNT | TOTALS |
|---|---|---|---|
| TOTAL NON–LIQUID ASSETS | | | $ 678,122.72 |
| TOTAL ASSETS | | | $1,445,109.32 |